**SAVE OUR CUMBERLAND MOUNTAINS, INC., et al.**

v.

**Donald P. HODEL, Secretary of the Interior, et al., Appellants.**

No. 85–5984.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1988.

Decided Sept. 16, 1988.

John A. Bryson, Attorney, Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and Robert L. Klarquist, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Joseph A. Yablonski, with whom L. Thomas Galloway, Washington, D.C., was on the brief, for appellees. Daniel B. Edelman, Washington, D.C., also entered an appearance for appellees.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting Opinion filed by Circuit Judge STARR, in which Circuit Judges SILBERMAN and BUCKLEY concur.

SENTELLE, Circuit Judge:

The panel opinion in this case, *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43 (D.C.Cir.1987), reviewed an attorneys' fee award entered pursuant to § 520(d) of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1270(d) (1982 & Supp.1986). In addition to making other modifications, generally not pertinent to this decision, the panel, based on the precedent of *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir. 1984), determined that the District Court had improperly computed the hourly rate for plaintiffs' attorneys, and accordingly ordered a remand for recalculation of that rate consistent with *Laffey* and the panel opinion. Thereafter, we accepted the case for rehearing *en banc, Save Our Cumberland Mountains, Inc. v. Hodel,* 830 F.2d 1182 (D.C.Cir.1987), and ordered briefing of the single question:

> Should *Laffey v. Northwest Airlines, Inc.* ... be overruled to the extent that it holds that in awarding attorneys' fees to a private law firm, that customarily charges below the prevailing community rate in order to serve a particular type of client, courts should calculate the "reasonable hourly rate" according to the hourly rates charged in similar cases by *that* firm, as opposed to rates that reflect the prevailing community rate for similar legal services?

*Id.* Having reviewed the question *en banc,* we now answer that question in the affirmative and overrule *Laffey.*

## I. BACKGROUND

The factual background of the substantive litigation underlying this attorneys' fee dispute is set forth in both the panel opinion and the District Court opinion, *Save Our Cumberland Mountains, Inc. v. Hodel,* 622 F.Supp. 1160 (D.D.C.1985). We will revisit only those facts directly relating to the fee petition and the question before us. The District Court had awarded fees for work performed by plaintiffs' four attorneys, Joseph A. Yablonski, L. Thomas Galloway, Daniel B. Edelman, and Lee Bishop. As the panel noted, the District Court applied the correct three-part analysis to determine the appropriate award: (1) determination of the number of hours reasonably expanded in litigation; (2) determination of a reasonable hourly rate or "lodestar"; and (3) the use of multipliers as merited. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). As to the second of these steps, the panel ruled that the District Court had erred as to the appropriate "reasonable hourly rate" for Yablonski and Galloway.

The District Court, in attempting to determine the reasonable hourly rate, first

noted the Supreme Court's determination in *Blum v. Stenson* that "[s]uch a reasonable hourly rate is that 'prevailing in the community for similar work.'" *Save Our Cumberland Mountains*, 622 F.Supp. at 1165 (citation omitted). He further noted this Circuit's prior holding that "[f]or an attorney who has a customary rate at which he or she bills fee-paying clients, the prevailing community rate has been said to be that customarily charged rate." *Id.* (citing *Laffey*, 746 F.2d 4 (D.C.Cir.1984)). He then held, following *Blum v. Stenson*, that "for an attorney who has no customary hourly rate, the Court must look to the prevailing community rates in order to determine the appropriate hourly rate." *Save Our Cumberland Mountains*, 622 F.Supp. at 1165.

The panel opinion noted that under *Laffey*, this case is factually distinct from *Blum v. Stenson*. In *Blum*, the attorneys seeking the fee awards were salaried employees of the Legal Aid Society of New York, a private, non-profit law office. The District Court had applied prevailing market rates for attorneys of like competence and experience in the same area doing similar work during the relevant period. *Stenson v. Blum*, 512 F.Supp. 680, 683 (S.D.N.Y.1981). The government argued to the Supreme Court for the adoption of a cost-based standard for fee awards to non-profit, legal aid attorneys, while recognizing that prevailing market rates were the proper standard attorneys in private for-profit practices. The Court rejected that theory and applied the same test for non-profit legal services organizations as the government had conceded was applicable to private attorneys.

The panel opinion of this Court reviewed *Blum* and *Laffey* and determined this case to be controlled by *Laffey*. Plaintiffs' attorneys in *Laffey*, like SOCM's attorney in the case at bar, charged some clients at hourly rates less than the prevailing average, from motives of subsidizing what they perceived to be "good" clients or clients with good causes. *Laffey*, 746 F.2d at 14 n. 69. We held in *Laffey* that the *Blum* treatment of public interest legal organizations was inapplicable to a quasi-public in-

terest law firm practicing for profit, but reducing rates from non-economic motives, and that the most "relevant comparison" was the rate charged in private representation by the attorneys seeking the awards. *Laffey*, 746 F.2d at 24.

In the present case, the panel applied *Laffey* and determined that Yablonski's average rate, for the 20 to 50 percent of his clients whom he charged on an hourly basis, was $100 per hour and that Galloway charged a "reduced rate" for "national environmental and conservation groups" of from $75 to $100 per hour. Applying the *Laffey* rule to those facts, the panel determined that $100 was the proper hourly rate for the determination of the lodestar as to Yablonski and Galloway.

It is in this posture that we now consider plaintiffs' contention that *Laffey* must be overruled.

## II. ANALYSIS

■ As both *Blum* and *Laffey* teach, the determination of an award of reasonable attorney fees is at bottom a question of statutory interpretation. In *Blum*, the Supreme Court construed the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988 (1976 & Supp. V), which expressly authorized the award of a reasonable attorney's fee to prevailing civil rights litigants other than the United States. In determining the intent of Congress as to the meaning of the phrase *"reasonable* attorneys fees" (emphasis supplied), the Court looked in large part to the Senate Report which approved the method employed in four cases, *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974); *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D. Cal.1974); *Davis v. County of Los Angeles*, 8 Empl.Prac.Dec. (CCH) ¶ 9444 (C.D.Cal. 1974); and *Swann v. Charlotte Mecklenburg Bd. of Educ.*, 66 F.R.D. 483 (W.D.N. C.1975). The Senate Report plainly expresses the intent of Congress that the *Johnson* case lays down the "appropriate standards," and that the standards are "correctly applied" in the other three cited cases which "'resulted in fees which are

adequate to attract competent counsel but which do not produce windfalls to attorneys.'" *Blum*, 465 U.S. at 893–94, 104 S.Ct. at 1546. (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976) U.S.Code Cong. & Admin.News pp. 5909, 5913).

The *Blum* Court then went on to determine from this legislative history that "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Id.* at 894, 104 S.Ct. at 1547.

Later that same year, we faced in *Laffey* the question of applying that statutory analysis to a fact situation, like the one at bar, in which the plaintiff's attorney did not fall neatly into either of the categories "private counsel" or "nonprofit legal services organization." The *Laffey* counsel, like SOCM's counsel, was literally engaged in private for-profit practice, but adjusted fee schedules downward from pro bono or quasi public interest motives to reflect the reduced ability of the client to pay or what the attorney saw as the importance and justice of the client's cause. The *Laffey* Court noted that the Supreme Court has interpreted "a reasonable attorney's fee" to be one that is "adequate" to attract competent legal advice, but does not produce "windfalls" to attorneys. *Laffey*, 746 F.2d at 16 (quoting *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548). Starting from this point of reference, the *Laffey* Court determined that *Blum*'s teaching with reference to the use of prevailing market rates applies only where, as in the case of the public interest nonprofit law firm, the attorneys have no billing histories, and a "proxy for the market must be found in order to set a reasonable hourly rate." *Laffey*, 746 F.2d at 16 n. 74. The *Laffey* Court then reasoned that the willingness of counsel to undertake the representation at his stated rate

proved the adequacy of that rate to attract competent counsel. To award higher rates based on the prevailing market, the Court reasoned, "would produce the very windfall Congress and the Supreme Court have said should be avoided." *Id.* at 25 (footnote omitted).

It was against this background of *Blum* and *Laffey* that the panel opinion in the present case attempted to determine a reasonable hourly rate for Yablonski and Galloway.[1] Thus the panel found that *Laffey* bound it to determination of the rates of the for-profit but public interest motivated attorneys that began with "relevant comparison" of the rates charged in similar private representation by the law firm itself. Next the panel held, obedient to the teachings of *Laffey*, that the Court should bracket that rate by establishing that it falls within the rates charged by other firms for similar work in the community. Then, "[s]o long as the firm's own rate falls within the rate brackets, it is the market rate, for the purposes of calculating the lodestar." *Laffey*, 746 F.2d at 25 (emphasis in original).

Since Galloway and Yablonski did in fact have hourly billing histories, the panel started with those rates, applied the *Laffey* brackets and concluded that the lower than prevailing market rate of $100 per hour was the appropriate rate and that the District Court had erred in using higher rates based upon its determination of the prevailing market.

The members of the panel spoke in three separate opinions expressing varying degrees of dissatisfaction with the *Laffey* rule. Judge Bork's opinion announced the decision of the Court but did so noting that "[w]hether or not *Laffey*'s position on this point is correct—and the dissent presents a serious argument that it may not be—this

---

1. As the panel noted, the attorneys' fee provision applicable to this case does not "require that the award be 'reasonable'; instead, it simply empowers the court to award fees to 'any party, whenever the court determines such award is appropriate.' 30 U.S.C. § 1270(d) (1982). Nonetheless, the Supreme Court has found that an identically worded fee statute in the Clean Air Act, 42 U.S.C. § 7604(d) (1982), should be

interpreted in accord with the more abundant jurisprudence addressing the attorney's fee provision in the Civil Rights Act, 42 U.S.C. § 1988 (1982), and other statutes that award a 'reasonable' attorney's fee...." *Save Our Cumberland Mountains*, 826 F.2d at 47. Therefore the analysis is the same as that pursued in *Blum* and *Laffey*.

panel is bound by that position as the law of the circuit." *Save Our Cumberland Mountains,* 826 F.2d at 49.

Judge Ruth B. Ginsburg separately concurred but joined the dissent's conclusion that *Laffey* "is of questionable consistency with *Blum v. Stenson* . . . and bears reexamination." *Id.* at 54 (citation omitted) (Ginsburg, Ruth B., J., concurring). Chief Judge Wald dissented in part, finding Galloway's rate policy to be distinguishable from that of the law firm in *Laffey,* but conceded the controlling precedent of *Laffey* as to Yablonski's fees. She then criticized *Laffey* as being inconsistent with *Blum,* producing anomalous results, and being a far distance from the congressional intent. As she put it "[i]f this is what *Laffey* has wrought, it is time that we or Congress took a harder look." *Save Our Cumberland Mountains,* 826 F.2d at 60 (Wald, C.J., dissenting in part).

Therefore, each member of the panel in differing terms and to differing degrees, questioned the correctness of the *Laffey* holding, but concluded that *"Laffey . . . is the law of the Circuit . . . and binds us unless and until overturned by the court en banc or by Higher Authority." Id.* at 54 (Ginsburg, Ruth B., J., concurring). This the Court *en banc* now does.

## A. *The Anomalous Result*

As Chief Judge Wald and Judge Ruth B. Ginsburg note in their separate opinions, the *Laffey* application of the *Blum* rule produces an anomaly. The highly paid commercial, for-profit law firm can receive awards equal to its usual handsome rates.[2] The legal aid attorney, tied to the prevailing market rate analysis of *Blum,* can look to the purely for-profit firm for evidence supporting a market rate calculation and receive the awards consistent with those of "[t]he highest paid law firm in town." *Save Our Cumberland Mountains,* 826 F.2d at 60 (Wald, C.J., dissenting in part). But, attorneys whose practice partakes of some elements of each of those two entities will receive fee awards often significantly smaller than those calculated on the com-

mon basis of the other two. That is, privately practicing but public interest motivated attorneys who intentionally charge their poorer clients reduced rates will receive the same reduced rates as statutory fees, even though they must depend upon the received fees for their livelihood.

To describe the result of the *Laffey* holding, and to observe it in the context of the present facts, is to reveal its anomalous nature. If the public spirited attorney is in a position, either by devoting the vast bulk of his time to other profit making representation or because of independent means, to represent the public interest group for free, then he can be awarded at high market rates for his pro bono efforts. That is, if he becomes a traditional for-profit practitioner using the market or higher fees charged to his commercial clients as subsidies for his pro bono clients during the course of their litigation, then his market rates will entitle him to the higher fee awards. On the other hand, if he always represents all clients free (whether or not they be deserving and impecunious), then his non-economic choices will result in the economic boon that *Blum* and *Laffey* provide for the attorney without a billing history. However, if either his own economic circumstances or the available but limited means of the client make it advisable to charge the client at rates providing some compensation but below the market rate, then those rates create a cap for his services. Thus, the practitioner outside the large or established firm may either eschew pro bono representation, directing those potential clients of the *Laffey* or *SOCM* mold to the established firm or legal aid societies if either of those entities is available and willing to undertake the representation, or quote fictitious but market-based rates, which neither he nor the client have any intention of actually seeing collected *in toto* unless court-awarded fees are ultimately available. Neither of these alternatives seems consistent with the policies behind fee shifting statutes or accepted prin-

---

**2.** Provided, of course, these do not exceed the *Laffey* brackets.

ciples of legal ethics.[3]

The effect of the anomaly upon the client has an even more negative impact. As this case illustrates, reduced profit public interest lawyers often acquire particular experience and expertise in specific public interest areas. The District Court's finding that "Mr. Galloway has had a coal-related practice for over ten years, and is considered on [sic] of the leading experts on the Surface Mining Act" stands unchallenged. *Save Our Cumberland Mountains*, 622 F.Supp. at 1164. If practitioners of his sort are unavailable, expertise in a specific area is likely to be found only in the firms which customarily represent coal companies and others who regularly litigate against public interest groups. Obviously, the possibility of conflict is so pervasive as to render this a less than desirable source of expertise. Of course "attorneys may ... [leave] the area of their professional expertise in taking on pro bono publico litigation ...," *Stanford Daily*, 64 F.R.D. at 684, but then the benefit of expertise is lost.

Of course, if Congress, in enacting the statutes which we now construe, expressed an intent to compel these results, we would have no choice but to accept them. It is not the function of this Court to rewrite statutes. Thus, if the *Laffey* construction of the fee shifting statutes is correct, the panel opinion would stand. However, as we demonstrate below, this is not the case.

### B. *The Congressional Intent*

The result sought by plaintiffs, that is a fee award based on prevailing market rates rather than the actual rates of Yablonski and Galloway, is not only not inconsistent with the express intent of Congress, but rather accomplishes Congress' express goals. As noted above, the very Senate

Report relied on by the Supreme Court in *Blum v. Stenson* reveals the goal to be "fees which are adequate to attract *competent* counsel, but which do not produce windfalls to attorneys." S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976) (emphasis supplied). By striking down the anomalous result of the *Laffey* rule, we in fact achieve the situation which one commentator has described as follows:

[P]ublic interest lawyers will continue to provide the specialization, freedom from conflicts with private clients, readiness to take on unpopular cases, and willingness to carry the cost of protracted cases that is indispensable to full enforcement.

Berger, S., *Court Awarded Attorneys' Fees: What Is "Reasonable"?*, 126 U.Pa.L. Rev. 281, 323 (1977).

■ Congress after all did not simply express its intent that the fees would attract counsel, but rather that they would be "adequate to attract *competent* counsel...." S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976) (emphasis supplied).

■ Nor should the congressional desire to avoid windfalls to attorneys deter this result. *Cf.* S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976). It is not inconsistent with the avoidance of windfalls to pay attorneys at rates commensurate with prevailing community standards of attorneys of like expertise doing the same sort of work in the same area. In fact, the Senate Report supports this conclusion. That Report, as noted above, was relied on by the Supreme Court in *Blum* as authoritative on the question of congressional intent in defining "reasonable counsel fees."[4] As also noted above, the Report cited three cases as correctly applying the appropriate standards in the lodestar analysis drawn from *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974). Examination of these

---

3. *See* American Bar Ass'n, Model Rules of Professional Conduct (1984), Rules 3.3, 4.1 (Candor and Truthfulness), and Rule 6.1 (Pro Bono Publico Service).

4. Again we note that the Supreme Court was construing a different fee awards statute, but again the analysis applies. *See supra* note 1. While the dissent accuses us of tilting at windmills, the dissent's consistent theme of tilting at

windfalls challenges opponents that are not even there. We do not propose, as the dissent suggests, that all attorneys be remunerated at the same rate, regardless of their competence, experience, and marketability. We only aim to provide that their experience, competence, and marketability will be reflected in the rate at which they are in fact remunerated.

cases supports the result we reach, as noted by the dissent in *Laffey,* 746 F.2d at 32–33 (Wright, J., dissenting).

The *Johnson* case itself is now often referred to as if it were the genesis of the lodestar method. That opinion did not in fact set forth the three steps described above of first determining the reasonable number of hours, then determining the reasonable hourly rate or lodestar, and then using multipliers as merited. What it actually did was set forth twelve "guidelines," now commonly referred to as the "*Johnson* factors," which the Fifth Circuit deemed appropriate for use in fee award calculations "consistent with those recommended by the American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106." [5] *Johnson,* 488 F.2d at 719. Those factors, which are now familiar in the jurisprudence of attorneys' fee awards, are:

(1) The time and labor required.

(2) The novelty and difficulty of the question.

(3) The skill requisite to perform the legal service properly.

(4) The preclusion of other employment by the attorney due to acceptance of the case.

(5) The customary fee.

(6) Whether the fee is fixed or contingent.

(7) Time limitations imposed by the client or the circumstances.

(8) The amount involved and the result attained.

(9) The experience, reputation, and ability of the attorney.

(10) The "undesirability" of the case.

(11) The nature and length of the professional relationship with the client.

(12) Awards in similar cases.

*Johnson,* 488 F.2d at 717–19.[6] The full lodestar approach was developed only over time. Much dispute has occurred, and some still exists, as to which, if any, of the *Johnson* factors may be considered for purposes of multiplication rather than in the original lodestar computation. *See, e.g., Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*); *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* —— U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*) and authorities collected therein.[7] Therefore, when the Senate Report expressed congressional approval of the *Johnson* factors, it was not approving the lodestar method, but rather the use of the factors that the *Johnson* Court employed.[8]

The lineage of the lodestar as such is more properly traceable to *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir.1973), which did in fact describe the product of a reasonable hourly rate and hours actually worked as being the "lodestar of the court's fee determination," subject to adjustment for "the contingent nature of success" and "the quality of [the]

---

**5.** Now embodied in the ABA Model Code, Rule 1.5. *See supra* note 3.

**6.** The *Johnson* Court discussed each factor in a separate paragraph. *See Johnson,* 488 F.2d at 717–19.

**7.** The modifications in the District Court's opinion ordered by the panel in the present litigation, other than those brought before this court *en banc,* involved adjustments to the District Court's calculation based on later developments drawn from the cited Supreme Court cases in the jurisprudence of fee awards applying the *Johnson* factors to the lodestar rather than as multipliers.

**8.** The dissent's enshrinement of enablement as "the Congressionally ordained purpose," p. 1529, *infra,* unduly emphasizes a single aspect. We do not deny the primacy of that goal but as we have demonstrated both Congress and the Supreme Court have made the congressional aims of "adequacy" and "competency" part and parcel of the statutory fee award computation. The dissent's reliance on the $75 per hour (with adjustments) cap in the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (1982), is particularly ill-advised. That statute can as easily be read as demonstrating that Congress knew how to cap a rate when it wished to do so. Since it did not apply this cap to the statute before us, we can then conclude the cap of the EAJA does not apply nor is it instructive. We note that no such capping intent appears in the Civil Rights Act, 42 U.S.C. § 1988 (1982), which is in fact instructive to our analysis. *See supra* note 1.

attorney's work." Thus, when the Senate Report expressed congressional approval of the *Johnson* case as "setting the appropriate standards" it was approving not the lodestar method per se but rather the use of the twelve *Johnson* factors in some fashion in arriving at the fee. It is the Senate Report's approval and the Supreme Court's adoption of that approval of the application of those factors in the other three cases that may be instructive to us in the present dispute.

In *Stanford Daily*, the District Court expressly sought to

> avoid the Scylla of simply accepting the attorneys' account of the value of the legal services which they have provided[, and] the Charybdis of decreasing reasonable fees because the attorneys conducted the litigation more as an act pro bono publico than as an effort of securing a large monetary return.

64 F.R.D. at 681 (citations omitted). It is the avoidance of the very Charybdis seen by the District Judge in that congressionally-approved application of the appropriate standards that we seek to accomplish by overruling *Laffey*. Since both the Senate and the Supreme Court by adoption have expressly approved that case, we are satisfied that our present decision not only avoids an undesirable anomaly but comports with the intent of Congress and the precedent of the highest court. Lest we be seen as reading too much into a single sentence of a single opinion adopted by a single reference in a Senate Report, examination of the other two approved decisions offers considerable support and no inconsistency to our conclusion.

*Swann v. Charlotte Mecklenburg Bd. of Educ.*, 66 F.R.D. 483 (W.D.N.C.1975), actually offers significant support. As noted by the dissent in *Laffey*, "[i]n *Swann* the court, in determining the amount of the fee award, looked to the rate charged by opposing counsel. Like *Stanford Daily*, *Swann* makes clear that Congress did not intend to use historical billing rates as a cap on fee awards." *Laffey*, 746 F.2d at 32 n. 3 (citations omitted) (Wright, J., dissenting). The *Laffey* majority concedes that

"the district judge [in *Swann*] may have based his award on the '[f]ees paid to opposing counsel,' as the dissent suggests. But we will never know, because he also listed eight other factors, including ... surrogates for historical billing rates...." *Laffey*, 746 F.2d at 23 (footnote omitted). As the majority in *Laffey* suggests, it is not entirely clear precisely what method the *Swann* Court did apply. This, however, does nothing to change the fact that the Senate Report and the Supreme Court have approved the *Swann* Court's application of the appropriate standards, nor does that criticism of the *Swann* case lessen its persuasiveness. At the time of the *Swann* fee award in 1975, the *Lindy Bros.* decision was less than two years old and was from the Third Circuit, while the *Swann* District Court was in the Fourth Circuit. *Johnson*, a Fifth Circuit decision, was less than one year old at that time. The *Swann* Judge had no reason to consider either decision binding upon him. The Fourth Circuit, the only Circuit which could authoritatively bind the *Swann* Court, did approve *Lindy Bros.* and *Johnson* in *Walston v. School Bd.*, 566 F.2d 1201 (4th Cir.1977), but not until two years after the *Swann* order and even then they did not require express obedience to either the *Johnson* factors or the *Lindy* lodestar method. It was not until 1982 that the Supreme Court finally authoritatively approved the *Johnson* factors and the lodestar approach in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982). That decision, as noted, left open the appropriate stage for the use of several *Johnson* factors, a dispute largely resolved in *Delaware Valley I, supra,* and *Delaware Valley II, supra,* but still not totally foreclosed. Thus it would be most surprising if the District Court's opinion in *Swann* were a prescient application of the exact factors in the exact fashion subsequently approved. Indeed, *Hensley v. Eckerhart* also quotes the above referenced Senate Report and briefly analyzes with approval *Johnson, Stanford Daily, Davis,* and *Swann*.

Thus, despite the criticism by the majority in *Laffey*, we find *Swann* to be instructive on the point we consider today. We

note first that it is by no means certain that the *Swann* Judge did not use something at least akin to the lodestar method. His published order runs less than three pages in total length and plainly reflects only the conclusion of an extended fee controversy. The opinion refers to extensive documentation including affidavits reflecting that plaintiff's counsel had expended more than 2,700 hours on the case. *Swann*, 66 F.R.D. at 485. The order expressly finds that "hourly rates in federal courts run from $30 to $35 an hour up to two or three times that figure." *Id.* at 486. He finally awarded fees of $175,000 which divided by 2,700 hours yields an apparent hourly rate of $64.81, well within the broad range (or "brackets") earlier referenced by the Court. In setting the fee at the referenced figure, he explicitly expresses a preference to "err on the conservative side in dealing with any fee question...." *Id.* Also in the order, he finds plaintiff's counsel to be exceptional in "reputation, experience and ability." *Id.* So it would appear that the *Swann* award is at least not inconsistent with the lodestar approach.

More significantly for our purposes, as noted above, the *Swann* Court expressly considered "[f]ees customarily charged for similar services." *Id.* He also considered as one factor the "[f]ees paid to opposing counsel." *Id.* at 485. The opposing counsel were conventional for-profit law firms.[9] The *Swann* fee award order expressly finds that plaintiff's counsel had been "compensated ... on a nominal basis." *Id.* at 486. As is apparent, the *Swann* Court based the fee award on the other factors it listed inclusive of "[f]ees customarily charged for similar services" and "[f]ees paid to opposing counsel" (for-profit firms) without any cap constructed from the lower or "nominal" fees which had been adequate to attract counsel not only competent but exceptional as to "reputation, experience, and ability...." *Id.* at 485–86. In short, the Senate and the Supreme Court,

by approving the application of the appropriate standards in *Swann*, evidence an intent consistent with our decision and inconsistent with that of *Laffey*.

The third case congressionally approved as properly applying the appropriate standards, *Davis v. County of Los Angeles, supra*, is not on point. That case involved a true public interest legal organization with no ascertainable billing history. That decision therefore presages the exact question answered in *Blum v. Stenson*. Nonetheless, *Davis* is in no sense inconsistent with our conclusion that Congress did not intend the private but public-spirited rate-cutting attorney to be penalized for his public spiritedness by being paid on a lower scale than either his higher priced fellow barrister from a more established firm or his salaried neighbor at a legal services clinic.

In short, we conclude that our prior decision in *Laffey v. Northwest Airlines, Inc.*, and the panel decision in this case, which it compelled, are both inconsistent with the intent of Congress in enacting fee award statutes and with the Supreme Court's decision in *Blum v. Stenson* which construed those statutes. We therefore expressly overrule *Laffey* to the extent that it imposes the above discussed different method of determining reasonable attorney fees on attorneys situated as Yablonski and Galloway are here. Henceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals.

### C. Second Litigation

■ The Secretary argues here, as Northwest Airlines did in *Laffey*, that the approach used by the District Court in the

---

**9.** The cited *Swann* decision does not expressly relate this fact. However, reference to the earlier reported decisions, in the underlying substantive controversy, *Swann v. Charlotte Mecklenberg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970), *Swann v. Charlotte Mecklen-*

*berg Bd. of Educ.*, 431 F.2d 138 (4th Cir.1970), and *Swann v. Charlotte Mecklenberg Bd. of Educ.*, 311 F.Supp. 265 (W.D.N.C.1970) reveals the names of defense counsel. Reference to any then current legal directory will confirm the nature of those firms.

fee calculation in each case, which we today adopt, is inconsistent with the Supreme Court's admonition that "a request for attorneys fees should not result in a second major litigation." The argument proceeds from there that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. Therefore, the Secretary contends, it must engender more fee litigation than the more easily applied *Laffey* method. However, the difficulty of application of the method Congress intended does not justify our abandoning it. Neither does it justify the anomaly that resulted from the *Laffey* rule.

Indeed, defendants' argument on this subject defeats itself. The very language from *Blum* argued by the defense here, as quoted by us above, comes from the *Blum* Court's analysis of the proper methodology for applying fee award statutes to public service legal organizations. The very paragraph cited by the Secretary goes on to say "[n]evertheless ... the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons." *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. Plainly the difficulty of determining market rate, though recognized by the Supreme Court in *Blum,* did not prevent that determination from being the proper basis for fee awards on *Blum*-type facts. Neither can it on *Laffey*-type facts.

### D. *The Remaining Remand*

Despite the fact that we vacate so much of the panel opinion as is inconsistent with this opinion (that is so much of that opinion as relied on *Laffey*), and adopt the reasoning of the District Court on the basic method of determining a reasonable hourly rate, a limited remand is necessary. In arriving at the "prevailing community rates" applicable to Yablonski's and Galloway's fee award determination, the District Court relied, at least in part, on the schedule of prevailing community rates compiled by the District Court in *Laffey. Save Our Cum-*

*berland Mountains,* 662 F.Supp. at 1165. The difficulty of that reliance is that, since the time of the District Court's opinion, the Supreme Court has made it plain that "absent an explicit waiver of sovereign immunity, attorneys' fees awarded against the federal government must be based on historical rates." *Save Our Cumberland Mountains,* 826 F.2d at 59 (Wald, C.J., separate opinion) (citing *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)). Thus, we must remand this matter for the limited purpose of new findings as to reasonable hourly rates at the time the services were performed consistent with this opinion.

We do not intend, by this remand, to diminish the value of the fee schedule compiled by the District Court in *Laffey.* Indeed, we commend its use for the year to which it applies. Perhaps the most desirable result of the present litigation would be the compiling of a similar schedule of prevailing community rates for other relevant years.

In making this remand we encourage the parties to act reasonably in pursuit of any possible settlement. Already this case has occupied the time of the Courts and the attorneys since 1981. Since 1985, the litigation has concerned attorneys' fees. Consistent with the admonitions of the Supreme Court in *Hensley v. Eckerhart,* we would urge the parties not to unduly prolong what is already "a second major litigation."

### VACATED AND REMANDED.

STARR, Circuit Judge, dissenting, in which Circuit Judges SILBERMAN and BUCKLEY concur:

In the thirteen years since the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), federal law has moved haltingly in the direction of the venerable English Rule with respect to the award of attorney's fees. We shall perhaps in the fullness of time advance back to where we began, for long ago, American law embraced the sensible

proposition that the winner should be made whole, including the recovery of attorney's fees. In the meantime, the present situation is quite anomalous. That is, the one hundred plus fee-shifting statutes now on the federal books typically operate only when the defendant is the United States, with the "shift" being a one-way arrangement. Non-governmental winners who leave the Government vanquished in the courthouse recover fees, but non-governmental losers ordinarily do not have to fear, for the United States is not entitled to fees when it wins. The United States Treasury is thus, as a general matter, in a sure-lose situation.

This, I hasten to add, is Congress' will, and as my colleagues rightly point out, our task in this enterprise is ultimately one of divining Congress' intent. "As both *Blum* and *Laffey* teach, the determination of an award of reasonable attorney fees is at bottom a question of statutory interpretation." Maj.Op. at 1518.

It is in this respect that *Laffey* deserves vindication, not burial. In my view, *Laffey* faithfully interprets Congress' will, especially as elucidated by recent decisions of the Supreme Court. In addition to being faithful to Congressional intent, *Laffey* has had the happy consequence of ushering in a rational, efficient, and sensible regime in the administration of justice in this jurisdiction. *Laffey* works. We should keep it.

## I

From its genesis, controversy has swirled around *Laffey*. Shortly after *Laffey's* birth, an effort was mounted to snuff out the decision, but the court thought the better of it at the time. We have now had the not inconsiderable benefit of several years of life with *Laffey*. Those have been happy years for the administration of justice in this circuit.

The criticisms, which have continued unabated, fall into two broad categories. The first is *Laffey's* asserted infidelity to Congressional intent; the second is the anomalous results said to flow from its operation. These are weighty charges indeed. The first is of course the pivotal indictment, for however asymmetrical *Laffey's* regime is said to be (save for the extreme circumstance, of which *Laffey* for all its manifold sins has never been accused, of triggering serious equal-protection questions), a conclusion that Congress ordained a different approach would perforce bring the debate to a speedy halt. And it is thus to the question of Congress' intent that I initially turn.

## II

### A

The commonly-aired critique—that *Laffey* fails to comport with legislative intent—is, upon analysis, built on sand. It rests in the main, as evidenced by my colleagues' analysis, on the fact that the pertinent Congressional Reports refer approvingly to three lower court cases, two of which the court's opinion today discusses at length. This is, with all respect, a singularly precarious basis for divining Congress' meaning. Quite apart from frequently voiced concerns as to the relevancy and helpfulness of legislative history, *Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987); *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2550–51, 101 L.Ed.2d 490 (1988); *United States v. Taylor*, —— U.S. ——, 108 S.Ct. 2413, 2423–24, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring); the Supreme Court itself has specifically indicated that caution is called for in this particular respect. By way of sobering example, one of the frequently cited cases in this field is the Fifth Circuit's decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974), which in a jurisprudential age fond of multi-pronged tests developed one of truly enviable complexity. Articulating no fewer than twelve factors to be considered by courts in establishing fees, *see* Maj.Op. at 1522, *Johnson* found itself widely followed by other courts and referred to with approbation by both the House and Senate Reports. Yet, notwithstanding this rather impressive following by a great cloud of witnesses in both the Article I and Article III branches,

the Supreme Court was recently unmoved by the legislative history's approbation of that decision. In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*), the Court observed that *Johnson* "was cited with approval by both the House and Senate when § 1988 was enacted into law," *id.* at 3097; nonetheless, in the next breath, the Court brought *Johnson's* hydra-headed analysis up short:

> [*Johnson's*] mode of analysis ... was not without its shortcomings. Its major fault was that it gave very little actual guidance to District Courts. Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results.

*Id.*

High Court departure from *Johnson*ian complexities was nothing new. Indeed, *Delaware Valley I* was only reporting on *Johnson's* demise. Although the legislative history's approbation of *Johnson* was unqualified, the decision's shortcomings had not been lost on the lower federal judiciary. To the contrary, it was in large measure *Johnson's* failings that led to the development of the lodestar approach by the Third Circuit. Lodestar analysis, then, represented a step forward in the evolutionary march from *Johnson's* rude beginning. But certain of the lodestar methodology's elements, in turn, eventually required refinement, as reflected in the Supreme Court's decision in *Hensley v. Eck-*

*erhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[1] Surely this has been just as it should be, with *Johnson's* approbation in the secondary materials emanating from Capitol Hill not arresting the law's orderly growth and development.

Attorney's fees jurisprudence has thus been, upon reflection, yet another evolving body of law. The law lives and learns. So too has the law governing attorney's fees awards. The point is that attorney's fees jurisprudence has not been placed on some Procrustean bed by the Supreme Court. To the contrary, the Court has weaved an elaborate body of law characterized by the familiar decisional-law qualities of refinement and rationalization in the same manner as other areas of adjudication. At the heart of this process has been (1) the search for the values and goals animating Congress in passing fee-shifting statutes, and (2) the evaluation and resolution of the abundant profusion of legal issues in light of those legislative goals. It especially bears noting that the evolution of the common law of attorney's fees has not been cabined by the Three Cases highlighted so extensively by my colleagues any more than the similarly approved *Johnson* decision arrested the law's development. Indeed, as the Supreme Court itself observed, the Three Cases themselves reflect a "divergence in both analysis and result." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, (Delaware Valley II)*, —— U.S. ——, 107 S.Ct. 3078, 3086, 97 L.Ed.2d 585 (1987) (plurality opinion).[2]

---

1. *Hensley*, I hasten to add, canvassed the three lower court cases invoked by my colleagues for the distinct point that in each of them the plaintiffs substantially prevailed in the litigation. The question in *Hensley*, in contrast to the issue before us, was whether a partially prevailing plaintiff could recover fees for legal services on unsuccessful claims. Especially in light of *Delaware Valley I*, it seems odd to suggest, without qualification, that the Supreme Court "finally authoritatively approved the *Johnson* factors and the lodestar approach." Maj.Op. at 1523. Indeed, in *Delaware Valley I*, after criticizing *Johnson* and noting the limitations of the three lower court cases, the Court stated that in *Hensley* "[we] ... adopted a hybrid approach that shared elements of both *Johnson* and the lodestar method of calculation." 106 S.Ct. at 3097.

2. My colleagues devote considerable energy to parsing the results and reasoning of the Three Cases. When all is said and done, I think it fair to say that the Three Cases boil down to only one decision of significant assistance to the issue that confronts us. And that is manifestly of no help to my colleagues. *Davis*, as the majority rightly says, is uninstructive on the issue before us. Maj.Op. at 1524. Next, *Swann* seems to lend itself to the same sort of debate as that swirling around constitutional or Biblical texts. As my colleagues candidly observe before launching into an exegesis on what *Swann* might mean, "it is not entirely clear precisely what method the *Swann* Court did apply." *Id.* at 1523. Just so. That leaves only *Stanford Daily*. For that, I simply refer the reader to

It is, upon reflection, odd for the court to stake so much in the interpretive exercise on such a slender reed as case cites found in the bowels of secondary materials produced in the word processors of Capitol Hill. *See supra* n. 2. But the oddity is all the more pronounced in the face of Supreme Court disinclination to canonize those materials, even if they had proved helpful to my colleagues. If our court is analytically on target today, then a staggering body of law, not the least of which are Supreme Court decisions that we are duty bound to obey, likewise stands condemned as unfaithful to Congress' will. For aught that appears, obeisance has been due not only to the Three Cases but to *Johnson* itself, which it would now seem has been treated shabbily indeed in very high places.

## B

Dwelling on the Three Cases is, ultimately, unavailing. Worse, debating the extent to which Congress carved the Three Cases (*sans Davis* for our present purposes) into statutory stone takes the judicial eye off the real question of *Laffey's* correctness. For even if the Three Cases, like *Johnson*, cannot stand the weight given them by my colleagues, the question remains whether *Laffey* itself faithfully echoes Congress' intent. That may have been a marginally closer question at the time *Laffey* was handed down. But the subsequent decisional law leaves me with not the slightest doubt that *Laffey* vindicates admirably the true Congressional purpose, as divined by the Supreme Court, in fashioning the fee-shifting statutes. Congress' real purpose was not, in my view, to stamp its seal of approval on a particular set of Delphic (in this particular) lower court cases. Its animating purpose was to enable individuals or organizations to secure competent counsel to represent them in asserting claims under statutes which Congress has seen fit to enact. The clear message of the Supreme Court in its recent cases is precisely to that effect, and therein lies *Laffey's* normative strength. What some have been tormenting as an ugly duckling has turned out to be a swan.

The clearest expression of Congress' purpose came two years after *Laffey* in *Delaware Valley I*. It is ironic in the extreme that we today inter a decision, hard-fought at the time, which subsequently won such approbation (on other points) from the *Delaware Valley I* majority. And there, in the course of a careful analysis (again, of points other than the question before us today) that noted with approbation Judge Wilkey's meticulous opinion in *Laffey*, the Supreme Court, speaking through Justice White, had this to say about Congress' purposes:

> [Fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, *the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.*

106 S.Ct. at 3098 (emphasis added).

The same theme was evident in *Delaware Valley II*. There, again speaking through Justice White, a plurality of the Court articulated the enablement goal in rejecting "enhancement for risk of loss"

---

Judge Wilkey's analysis in *Laffey* itself, where he indicates, persuasively, that *Stanford Daily* actually *supports* the *Laffey*-ordained methodology. 746 F.2d at 22–23.

Tellingly, the majority does not contradict this in the slightest. Rather, the court seeks to avoid a *Stanford Daily*-inspired "Charybdis" of "decreasing reasonable fees because the attorneys conducted the litigation more as an act pro bono publico than as an effort of securing a large monetary return." Maj.Op. at 1523, *quoting Stanford Daily*, 64 F.R.D. at 681. With all

respect, this is pure mythology. *Laffey* can in no wise be seen as working a "decreasing of fees" when it neutrally applies (again presumptively only) the for-profit attorney's ordinary billable rate (including, on the upside, for-profit lawyers with relatively high billable rates). Upon reflection, the "Charybdis" here is, of course, but a reference to our familiar friend, the *"Laffey* anomaly," which is for reasons stated later in my opinion of the for-profit attorney's own making.

for successful plaintiffs. "[A] fundamental aim of [fee-shifting] statutes is to make it possible for those who cannot pay a lawyer for his time and effort to obtain competent counsel, this by providing lawyers with reasonable fees to be paid by the losing defendants." *Id.* at 3086 (plurality opinion).

Now let it not be thought that the plurality was blind to the possibility that, without such enhancements, *some* lawyers might see fit to decline a particular representation. But the bar in general, Justice White opined, would not turn its back on such representations, and that fact vindicated the enablement purposes animating Congress in crafting fee-shifting legislation.

The Court has re-articulated the enablement theme time and again. *See, e.g., Marek v. Chesny,* 473 U.S. 1, 10, 105 S.Ct. 3012, 3017, 87 L.Ed.2d 1 (1985); *Blum v. Stenson,* 465 U.S. 886, 893–94, 104 S.Ct. 1541, 1546–47, 79 L.Ed.2d 881 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1988). And enablement, as the Supreme Court has described it, is a minimalist test. It does not mean access to F. Lee Bailey, Gerry Spence, Racehorse Haynes, or the leading trial lawyer in a particular locale. It means, as the Court put it in *Hensley v. Eckerhart,* " 'effective access to the judicial process.' " 461 U.S. at 429, 103 S.Ct. at 1937 (quoting H.R.Rep. No. 94–1558, p. 1 (1976)). The idea is to permit plaintiffs to secure the services of a competent lawyer. Indeed, that is the very language used in the legislative history to describe the Three Cases. "These cases have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." S.Rep. No. 94–1011, p. 6 (1976), quoted in *Blum v. Stenson,* 465 U.S. at 893–94, 104 S.Ct. at 1546. "Adequacy" and "competency" are the key words that give life to the "enablement" theory. *Laffey* itself captured the enablement goal in the following passage:

> The "windfall" Congress sought to avoid is the awarding of fees in excess of the rate at which qualified counsel would be willing to represent civil rights claimants who have legitimate grievances. The congressionally-mandated inquiry is thus *not* into the "true value" or worth of an attorney's services. Instead, the trial court must ascertain the fee at which competent counsel would be willing to accept meritorious civil rights cases. As this court recently stated in *Murray v. Weinberger,* [741 F.2d 1423 (D.C.Cir. 1984)] "the purpose of the statute [authorizing fee shifting in Title VII cases] is to benefit meritorious claimants—not to subsidize the legal profession."

*Laffey,* 746 F.2d at 16 (citations omitted).

C

Enablement, not the avoidance of billing incongruities (or apparent anomalies) is the goal against which *Laffey* is to be measured. Enablement, not maximization of the range of private-party choice, is the Congressionally ordained purpose.

In my view, *Laffey's* approach is well crafted to serve the aims of the Article I branch. An attorney's customary billing rate provides, by definition, a sensible, rational method of achieving enablement. Private parties with grievances against the Government can, under *Laffey,* enlist the services of a for-profit attorney secure in the knowledge that, if success indeed lies ahead, his or her attorney's customary rate will be recoverable in the action. *Laffey's* effectuation of enablement values seems all the more manifest in light of Congress' imposing, in the Equal Access to Justice Act, 28 U.S.C. § 2412(d), a $75 per hour (adjusted for inflation) cap, absent "special factors" which we now know are limited indeed, *see Pierce v. Underwood,* 108 S.Ct. at 2553–54. In our jurisdiction here in Washington, notorious for its high cost of living, customary billing rates are highly likely to exceed the EAJA-mandated cap, a level which Congress must have thought served the enablement purposes undergirding fee-shifting statutes. With EAJA's $75 per hour cap across the board and across the Nation, *Laffey's* more generous billing regime is obviously all the more attractive (and "enabling").

True, able counsel such as Messrs. Yablonski and Galloway would be more receptive to taking on such matters if the ultimate fee recovery exceeded their customary billing rates. During oral argument, Mr. Yablonski poignantly represented to the court that the economics of his practice might well not permit this kind of low-yield case in the future. That would surely be unfortunate. But be that as it may, "enablement" should be tested systemically, not on whether a particular attorney, no matter how able and distinguished, will see fit to take on a particular representation. As the *Delaware I* Court put it so succinctly: "[I]f plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied." 106 S.Ct. at 3098. It is "a lawyer," not the lawyer of choice, that the statute seeks to provide.

Here, two of the four private attorneys who represented Save Our Cumberland Mountains (*et al.*) are seeking rates that are approximately 50% higher than the rates they had customarily been paid by their hourly-fee paying clients. If one is on the look-out for anomalies, this, it seems to me, could readily fall within the category of "incongruity," if not "anomaly," especially since Congress has set in motion a statutory fee-shifting mechanism geared to hourly rates. Indeed, upon reflection, it is evident that if a lawyer has a customary hourly rate, then that rate is at least presumptively (although not inevitably) the product of market forces, including such factors as the identity and perceived worthiness of the client and of its particular cause.

To state the obvious, it may well be (and frequently is) the case that able lawyers representing "bad" clients will charge higher rates than equally able lawyers representing "good" clients. Attorneys who make their living representing, say, organized crime chieftains, drug traffickers or socialite murderers may desire and seek the comfort and security of a premium fee to compensate for, among other things, the relative undesirability that other attorneys might discern in such representations. To bring the point closer to home, law firms that choose to represent large for-profit corporations accused, say, of violating the environmental laws or engaging in employment discrimination may (by way of example) find it congenial (if not necessary) to offer premium starting salaries, *cum* bonuses, to young lawyers fresh from the rigors of law school and bar exams; likewise, young lawyers in the dewy dawn of their careers may find themselves lured by large-firm provided pots of gold at the end of the law review rainbow even if these budding young talents would prefer, all things being equal, to be representing the Lands Division or a private environmental group, say Save Our Cumberland Mountains, Inc., in environmental litigation or the EEOC or private plaintiffs in employment-discrimination matters. The point, which is sufficiently obvious to members of the legal community not to warrant further belaboring on my part, is that for a wide variety of reasons a client need not pay K Street Corridor rates to secure splendid, indeed peerless representation.

I hasten to add that *Laffey* did not purport mechanically or slavishly to carve the customary billable rate into statutory stone. To the contrary, *Laffey* features built-in protections that, for whatever reason, neither Mr. Yablonski nor Mr. Galloway has seen fit to invoke, namely that the customary hourly rate is only the *presumptive* market rate. That rate, the *Laffey* court contemplated, might well be aberrationally high or low. *Laffey,* 746 F.2d at 25. *Laffey* thus integrated into its carefully wrought structure an escape hatch so as to prevent a bizzare or idiosyncratic result. *Laffey,* in short, provided a margin of flexibility that, it seems to me, further buttresses the strength of its enablement-centered approach.

### D

As the foregoing discussion suggests, the asserted gravamen of the complaint against *Laffey* is that it is inconsistent with Congressional intent. The legal battleground over *Laffey*'s correctness is, I be-

lieve, precisely as it should be, as opposed to what seems to me a false issue, rightly brushed aside by my colleagues, that *Laffey* is somehow inconsistent with the Supreme Court's decision in *Blum v. Stenson.* Since my colleagues quite rightly examine *Laffey* for its fidelity to Congress' will, as opposed to measuring it against the yardstick of a footnote in a Supreme Court case which resolves an entirely different issue than that which *Laffey* addressed,[3] suffice it to say that the *Laffey*-violates-*Blum* canard is but another of those frequently encountered species in the law, an argument with superficial appeal and no substance. The charge, in fact, requires more than a small dash of cheek, since Justice White, the author of both *Delaware Valley I* and *II,* has set forth his view that *Blum* does not resolve the question in this case. *See Webb v. Maldonado,* ––– U.S. –––, 108 S.Ct. 480, 98 L.Ed.2d 509 (1987) (White, J., dissenting from denial of certiorari). A fair reading of *Blum* demonstrates the force of Justice White's view which I, for one, am singularly disinclined to contradict.

The criticism, nonetheless, is by its nature a serious one and thus merits respectful evaluation. *Blum,* it scarcely needs repeating, involved a recovery for attorneys' fees under the civil rights statute, 42 U.S.C. § 1988, by attorneys from the Legal Aid Society of New York. Like other such organizations, the Society is a *nonprofit,* private law office. Of venerable age, the Society "enjoys a wide reputation for the devotion of its staff and the quality of its service." *Blum,* 465 U.S. at 890 n. 3, 104 S.Ct. at 1544 n. 3. Through the efforts of three able attorneys, the Society had made rather short order of a practice by New York State which terminated Medicaid eligibility automatically upon the individual's termination of eligibility for benefits under the Supplemental Security Income program. Success on the merits was quick and complete, leaving only the question of attorney's fees.

Although the case abounded with the underbrush that proliferates in attorney's fees cases, the Supreme Court, speaking through Justice Powell, addressed only two issues. The one of relevance to our inquiry is "whether Congress intended fee awards to nonprofit legal service organizations to be calculated according to cost or to prevailing market rates." *Id.* at 889, 104 S.Ct. at 1544. The case thus had nothing whatever to do with *for-profit* law practice, which is of course the nature of the practice of Messrs. Yablonski and Galloway. What the Court had before it was an argument, vigorously pressed by New York and supported by a veritable legion of Attorneys General from across the Nation, that "*all* fee awards under § 1988 [should] be calculated according to the cost of providing legal services rather than according to the prevailing market rate." *Id.* at 892, 104 S.Ct. at 1546. (emphasis added) (citation omitted). The Solicitor General, as *amicus curiae,* argued less sweepingly that a cost-related standard should be adopted only for nonprofit legal aid organizations. *Id.*

Justice Powell then turned to the statute and its legislative history. He found there not the slightest support for a cost-related standard, as urged by New York and its many sovereign supporters. Canvassing the lower court decisions featured in the Senate Report, which I have previously had occasion to address *see* n. 2 *supra,* the Court found that "[i]n all four of the cases cited by the Senate Report, fee awards were calculated according to prevailing market rates." *Id.* at 894, 104 S.Ct. at 1546.[4] The legislative history was likewise clear, the *Blum* Court went on, "that Congress did not intend the calculation of fee awards to vary depending on whether the plaintiff was represented by private coun-

---

3. The court does say in passing that *Laffey* is inconsistent with *Blum,* Maj.Op. at 1524–25, but there is no development or argumentation on the point. As the court's opinion stands, this is more of a glancing blow at the conclusion of its non-*Blum*-related analysis.

4. Lest the careful reader think that I have conveniently overlooked my earlier critique of the court's unrestrained reliance on the Three Cases, plus *Johnson, sans Davis,* it bears noting that the Court's opinion in *Blum v. Stenson* pre-dated the Court's own critique of those cases in *Delaware Valley I.*

sel or by a nonprofit legal services organization." *Id.* at 894, 104 S.Ct. at 1547. The Court thus resolved the issue before it; no bifurcation would be created between non-profit and for-profit firms. But the Court plainly did not, as some would have it, suggest that all for-profit attorneys were to be paid the hypothesized "prevailing market rate." The Court suggested exactly the opposite:

> Market prices of commodities and most services are determined by supply and demand. *In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community.*

*Id.* at 895 n. 11, 104 S.Ct. at 1547 (emphasis added). Of course there's not. Even within a single law firm, Justice Powell went on, the type and quality of services rendered by lawyers will vary extensively. And then the Court expressly took cognizance of the hard, cold reality which *Laffey* likewise recognized: "[T]he hourly rates of lawyers in private practice ... vary widely." *Id.* For that simple, undebatable reason, the Court observed, reviewing courts appropriately required affidavits to confirm that the rates requested by practitioners were, in effect, not "out of line." That sort of rate "is normally deemed to be reasonable, and is referred to—for convenience— as the prevailing market rate." *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11.

This discussion in *Blum*, it seems to me, in no way lends itself to the interpretation so heatedly pressed by appellees that for-profit attorneys must be paid at an hypothesized "prevailing market rate." To the contrary, the Court took pains to recognize the abundantly obvious fact that rates among private, for-profit practitioners will vary widely. Even in an egalitarian age, *Blum*'s footnote 11 does not fairly support the interpretation that reviewing courts are to obliterate the manifold distinctions which abound in the legal services market and then crudely lump every practitioner of comparable experience into the same rate category. As I previously indicated, different law firms have different billing structures for a wide variety of reasons. What is more, some lawyers are actually better

at lawyering than many of their colleagues of comparable experience at the bar. Everyone knows it. Clients certainly know it. And courts do too. Quite apart from billing structure, which presumably explains the lower rates charged by Messrs. Yablonski and Galloway, there is such a thing as superior skill, knowledge and ability. Rates reflect that reality of life.

All this suggests, ultimately, that the attack on *Laffey* revolves around deeply felt views animating much of modern-day social policy. It is the vision of equality as an ideal, equality as the watch-word to vanquish all perceived differences and disparities, that the assault on *Laffey* is all about; no matter that the legal world is filled with disparities that some might deem false and artificial—say, the fact that appellate judges are remunerated at higher levels than trial judges. And that brings me, at last, to the true basis of the assault on *Laffey*.

### III

Upon reflection, it will be seen that the real charge laid at *Laffey*'s feet, and that most extensively featured by my colleagues, is that it creates anomalies. The charge is stated in the following way:

> [P]rivately practicing but public interest motivated attorneys who intentionally charge their poorer clients reduced rates will receive the same reduced rates as statutory fees, even though they must depend upon the received fees for their livelihood.

Maj.Op. at 1520. Elsewhere, my colleagues put it this way: "Congress did not intend the private but public spirited rate cutting attorney to be penalized for his public spiritedness by being paid on a lower scale." *Id.* at 1524.

Quite aside from my not substantial quarrel with the notions that "rate cutting" is going on here, for which there is not the slightest evidence, and that a "public spirited" attorney is being "penalized" for "public spiritedness" (when in fact the *Laffey* rule simply calls in even-handed fashion for the for-profit attorney presumptively to be

paid at his or her customary for-profit fee), the underlying "anomaly" that so vexes my colleagues is ultimately ineradicable by the judiciary by virtue of the for-profit attorney's decision to fix his or her fee levels at lower than those charged by large firms in the K Street Corridor representing (typically) rather different sorts of clients.

Indeed, the problem with the quixotic quest to rid attorney's fees awards of anomalies is that, like other such quests, it is ultimately tilting at windmills. What is an "anomaly"? Here is a candidate for that sobriquet which is rather close to home. Some if not most judges may, at the close of another demanding day, find it anomalous that former colleagues in their respective former law firms are garnering several-fold the amount earned by federal judges. But judges have made a choice, which carries with it certain consequences that they will hopefully grin and bear. Indeed, the "anomaly" of public servants being paid a fraction of what private actors receive for "comparable" services is too manifestly evident in this community to require extended discussion. But there are, presumably, other (some might say loftier) compensations of a decidedly non-monetary nature that, to borrow a recent phrase, enriches and ennobles the daily labors of public servants, including judges, in carrying on their duties.

In sum, as to the overriding concern about "anomalies," I despair of improving upon Judge Wilkey's response, in which the wise Judge Tamm concurred:

> Laffey finds anomalous the possibility that two different law firms with lawyers of similar credentials might receive different hourly rates for work on the same case. To the extent that an anomaly exists, it mirrors the anomalous situation that would exist if the same firms were hired by a fee paying client.

746 F.2d at 18 n. 94. How true. The anomaly so bewailed by my colleagues is, as Judges Wilkey and Tamm recognized, built into the very structure of the billing "system" that the various firms and practitioners have, cumulatively, erected. For judges to carve out large, upward-ratchet-ing exceptions to the structure erected by the interplay of numerous private actors, who are responding to a veritable sea of both internal and external factors (not the least of which is the targeted set of clients that the for-profit attorney seeks to service, which as I alluded to above builds in its own practical limitations as to billable rates), amounts, of course, to constructing a judicially mandated system of subsidy for other, less remunerative aspects of the for-profit lawyer's practice. And this economic effect, it seems to me, comes perilously close to creating the windfall that the enablement theory, as elucidated so clearly of late by the High Court, was intended to avoid.

## IV

That brings me to the final point in *Laffey's* defense. It works. Just the other day, the Supreme Court reminded the lower courts, who obviously face the not insubstantial daily brunt of attorney's fees litigation, of the abiding values of the sound administration of justice in this arena of our work. *Pierce v. Underwood*, 108 S.Ct. at 2547. Rational administration of the new, post-*Alyeska* burdens on federal courts, like the value of enablement, has been an abiding theme of Supreme Court decisions. The point was aptly made by Justice White, speaking for the plurality in *Delaware Valley II*:

> Fee litigation occurs on a case to case basis and is often protracted, complicated and exhausting. There is little doubt that it should be simplified to the maximum extent possible.

107 S.Ct. at 3085. *Hensley* captured the same thought in its oft-repeated admonition: "A request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437, 10 S.Ct. at 1941.

Of *Laffey's* high marks in this particular there can be no reasonable doubt. At considerable length, Judge Wilkey, with his vast experience as a judge, canvassed the benefits that he predicted would flow from the rule which the court there crafted. He was right on target. His discussion on this

point, set forth at 746 F.2d at 18–22, deserves respectful rereading, for it contains powerful and unanswered points. Indeed, the modest two paragraphs devoted by my colleagues to this vital subject, *see* Maj.Op. at 1524–25 wisely do not even seek to question the manifold advantages flowing from *Laffey's* approach.

As I understand the court's brief response in this particular, it is two-fold: (1) ease of administration does not justify overturning Congress' ordained methodology (a point with which I quarrel, obviously, only by virtue of its mistaken premise); and (2) since difficulty of administration did not lead the Supreme Court in *Blum* to abandon the fee-setting enterprise, neither can it prevent that determination on "*Laffey* -type facts." *Id.* at 1525. With all respect, the latter response is *ipse dixit* accompanied by a strain of the discredited *Laffey* -violates-*Blum* theme. It fails to take into account that in *Blum* the only alternative to an hypothesized "prevailing rate" was a cost-based rate and that that sort of regime was squarely foreclosed by Congress' clear intent to the contrary. It thus behooves me to repeat that neither Congress nor the Supreme Court has resolved the precise question before us and that *Laffey's* answer to that question has the highly desirable effects that Judge Wilkey promised it would. The point is well captured by the Government's brief on rehearing en banc:

> This Court in *Laffey* predicted that the approach that it adopted would reduce fee litigation by establishing a predictable and objective standard for setting hourly rates. That prediction was accurate. * * * * Since *Laffey*, ... litigation over fees has been greatly reduced because of the relative ease of determining an attorney's customary billing rate. The *Laffey* standard has promoted settlements and has reduced major, second round litigation over fees.

Brief for Appellants at 25.

Even apart from our practical experience under *Laffey*, a decent respect for prece-

dent should counsel restraint in this area. The mere fact we agreed to reexamine *Laffey* does not mean that the force of precedent is out the window—even for the court sitting *en banc*. More should be required before abandoning a decision that has served us so well.

\*    \*    \*    \*    \*    \*

These have thus been, in retrospect, the halcyon years for our jurisdiction in this singularly unproductive genre of litigation. Judicial ratemaking will now be re-ushered in with gusto, with countless hours undoubtedly awaiting the court as an administrative entity, complete with the requisite and entirely appropriate consultations with the bar, on how to carry on this essentially managerial task. For either we must engage in circuit-wide ratemaking, which we will be required to adjust periodically, or we will be faced with reconciling conflicting determinations of prevailing rates by various District Judges. In short, the approach in overturning *Laffey* that the court adopts today will create an enormous administrative burden for this court, inconsistent with the Supreme Court's latest pronouncement. With our increasing docket summoning us to even greater productivity, I must confess to a singular want of excitement over renewing the judicial focus on the level of income to be enjoyed by the distinguished bar of this jurisdiction. But with *Laffey's* demise, the time is nigh to gird our loins, for the executive sessions of our court, conclaves with the bar, and policy pronunciamentos lie just around the corner. I respectfully dissent.