Soon Y. PARK, Plaintiff,

v.

**HOWARD UNIVERSITY, Defendant.**

Civ. A. No. 92–2662–OG.

United States District Court,
District of Columbia.

Feb. 23, 1995.

St. John Barrett, Washington, DC, for plaintiff.

Janet Holt, William P. Flanagan, Hogan & Hartson, Washington, DC, for defendant.

### MEMORANDUM

GASCH, Senior District Judge.

Plaintiff was awarded a judgment following a bench trial in the amount of $150,000. Pursuant to the outcome of the case, counsel has filed a motion for the award of an appropriate fee. The Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), discussed this subject and what constitutes a reasonable fee. The Court of Appeals for this Circuit in an *en banc* opinion, *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988), discussed these two Supreme Court opinions and with some specificity enunciated the rule on this subject as follows:

> Henceforth the prevailing market rate method heretofore used in awarding fees to traditional or private firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting noneconomic goals.

*Id.* at 1524.

Plaintiff's counsel, with these decisions in mind, has afforded the Court substantial information as to what constitutes the prevailing market rate for cases of the character of this law suit in this jurisdiction. He has supplied affidavits and declarations of experienced counsel in this field of litigation—both those in general private practice firms and those who specialize in civil rights cases. Generally, they concur that the requested fee of $300 an hour is entirely reasonable for one having the experience in civil rights matters and the expertise in that field as plaintiff's counsel.

Mr. Barrett graduated from the University of California Law School at Berkeley in 1948

and was admitted to the California Bar in 1949. He served as deputy district attorney in Alameda County through the end of 1954. In January 1955, he was appointed and served in an executive position as trial attorney at the Department of Justice, Washington, D.C. He was appointed chief of the Civil Rights Section of the Criminal Division in 1957. When the Civil Rights Act of 1964 was enacted, he was designated executive assistant to the Assistant Attorney General in charge of the newly established Civil Rights Division of the Department of Justice. During this period, he tried many civil rights cases before three-judge courts throughout the country. Judge Joseph M.F. Ryan served as Acting Assistant Attorney General during a portion of this time and enthusiastically commended as outstanding the character of Mr. Barrett's service. The Court's colleague, Judge Harold Greene, who was Mr. Barrett's colleague in the Civil Rights Division, was equally enthusiastic about the service rendered by Mr. Barrett. In 1967, he was appointed Deputy General Counsel in the Department of Health, Education, and Welfare. This position he held for ten years. In private practice in 1977, he spent most of his time on appeals in antitrust matters. In 1982, he opened his own law office, specializing in civil rights matters, particularly, employment discrimination cases. He accepts cases on a *pro bono* basis from the Washington Clinic for the Homeless, Legal Counsel for the Elderly, and The Washington Lawyers Committee for Civil Rights Under Law. Depending on a client's ability to pay, he has agreed to accept compensation ranging from $50 to $125 an hour.

■ Counsel's retainer agreement with the plaintiff contains the following language:

If Dr. Park obtains relief on her complaint, either by administrative order, by court judgment, or by settlement to which she agrees, she will pay Mr. Barrett $125 per hour of his professional services; *provided:* that if attorney's fees are allowed in any proceeding against Howard University, the amount that Dr. Park will be obliged to pay shall be the amount so awarded. If Dr. Park is neither awarded any relief on her complaint nor agrees to any settle-

ment, Mr. Barrett will be entitled to no fee.

Ignoring the *proviso,* defense counsel argued that since the first part of this agreement contained the rate of $125 per hour, that is the controlling rate. This interpretation ignores the *proviso* and is contrary to the decision of the Supreme Court in *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, and *Save Our Cumberland Mountains, Inc.,* 857 F.2d at 1519.

■ Generally, a reasonable fee in matters of this kind is determined by multiplying the number of hours reasonably spent on the project by the figure which represents the prevailing market rate for the services of the lawyer in the category of the applicant.

In Howard University's opposition to plaintiff's motion for attorney's fees and costs, filed October 17, 1994, note 3, page 4, reads as follows: "The University does not challenge the number of hours Park's lawyer spent on this case nor does it challenge the costs requested."

With this concession in mind, the remaining issue is the determination of a reasonable rate for Mr. Barrett's services. The *Laffey* matrix, as modified to conform to the *Save Our Cumberland Mountains* en banc decision, provides for a fee of $300 an hour for one with 20 years or more of experience for services rendered in the years 1992 and 1993. This computation was done by Mr. Daniel F. Van Horne, Assistant United States Attorney, and incorporated as Exhibit A to Mr. Barrett's second supplemental submission filed on January 18, 1995.

Filed as Exhibit B to this submission is the Declaration of Mr. John C. Keeney, Jr., a partner in the law firm of Hogan & Hartson, in charge of the firm's community services department. He filed this declaration on behalf of the plaintiffs in *Terence Manuel, et al. v. P & D's Flying Circus, Inc., d/b/a World Gym of Wheaton,* Civil Case No. S–89–3538 in the United States District Court for the District of Maryland. Mr. Keeney, in a lengthy declaration, advised the Court that he was a 1976 *cum laude* graduate of the Harvard Law School and had extensive experience with fee matters in civil rights cases

and based on current rates, he had submitted a bill in the amount of $240 per hour for services rendered and that he had approved a bill for Mr. Stephen Routh, who graduated from the Harvard Law School *magna cum laude* in 1983 and since 1991, a partner in Hogan & Hartson, at the reduced rate of $195 a hour. The bill of Mr. Stephen Hollman, a 1983 graduate of the University of Virginia Law School, was approved by Mr. Keeney for a rate of $185 an hour.

Mr. Keeney qualifies as an expert in determining fees in civil rights litigation cases. In the case of *Cheryl Feeling, et al. v. Sharon Pratt Kelly, et al.*, Civil Action No. 82–2994, in this Court, an affidavit by him as to the value of counsel's time revealed the following conclusions. Mr. Cunningham had approximately twenty years' experience in 1992 and Mr. Berlow, who had approximately sixteen years' experience, were rated at $295 per hour and $250 per hour, respectively. His affidavit also reflected that Hogan & Hartson would bill $300 for Mr. Cunningham and $275 per hour for Mr. Berlow for services rendered in 1993. The Court's records further indicate that Mr. Cunningham is the managing attorney for Neighborhood Legal Services and Mr. Berlow is a solo practitioner.

In support of Mr. Barrett's fee application, the Declaration of Stephen J. Pollack has been submitted. Mr. Pollack's experience includes service as Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice, 1967–69, as well as service as Assistant to the Solicitor General of the United States, 1961–64. Mr. Pollack's declaration reveals that he had frequent contact with Mr. Barrett concerning the work of the Civil Rights Division in which Mr. Barrett was serving. Mr. Barrett's time was devoted primarily to precedent-setting cases [1] in the Civil Rights Division and supervising other lawyers in such cases. As Chair of Shea & Gardner's Executive Committee, since 1993 Mr. Pollack has supervised the firm's billing practices and is familiar with billing rates for attorneys of various experience levels similar to the case *sub judice*. By reason of Mr. Pollack's experience with Shea & Gardner and his general familiarity

with the level of fees charged by attorneys experienced in civil rights litigation and his past association with Mr. Barrett and his knowledge of Mr. Barrett's litigating skills, he states that Mr. Barrett is qualified by reason of his years of experience and legal knowledge and litigating skills to justify a fee in the highest bracket of the *Laffey* matrix as modified.

Daniel A. Rezneck, a partner in the law firm of Arnold & Porter, in his affidavit, filed by the plaintiff, states that he has extensive experience litigating attorney's fees issues and he is familiar with the standards governing the setting of attorney's fees and the applicable federal statutes and the billing rates of lawyers in Washington, D.C., who engage in active litigation in the federal courts. Arnold & Porter's billing rate for attorneys having one to three years' experience is between $135 and $180 an hour in 1992. His firm's billing rate for lawyers with 20 or more years' experience is generally between $260 and $330 per hour in 1992.

Gerald P. Norton's declaration states that he is a partner in the law firm of Pepper, Hamilton & Scheetz. Billing rates for lawyers in his firm are set annually based on the length of time since graduation from law school and his or her experience and areas of expertise. For a lawyer one to three years out of law school, the billing rate would be between $105 and $130 per hour since July 1, 1991. For lawyers with more than 20 years of experience, the rate has been $220 to $330 per hour since July 1, 1991.

The Affidavit of Mitchell Rogovin, a partner in the firm of Donovan Leisure, Rogovin, Huge & Schiller in Washington, D.C., reflects that billing rates in that firm depend upon the experience of the lawyer and the time since the lawyer graduated from law school. For one with one to three years' experience, $105 to $125 per hour would be billed. One hundred thirty dollars per hour would be billed in 1992. For one with 20 or more years' experience, $300 per hour would be billed in 1993.

The Affidavit of Richard L. Jacobson, a partner in the firm of Fulbright & Jaworski, reflects a billing rate for attorneys with 20 or

---

1. Mr. Barrett's affidavit identifies some of these three-judge cases.

more years' experience to be between $275 and $350 per hour in 1992. The billing rate for paralegals was between $55 and $85 per hour in 1992.

Thomas P. Gies, a partner in the firm of Crowell & Moring, furnished an affidavit with respect to rates charged in the case of *Carolee Brady Hartman, et al. v. Joseph Duffey,* Civil Action No. 77–2019. His firm's non-contingent rates for employment discrimination work are as follows:

| Crowell & Moring Attorneys | Year of Grad. | Rate |
| --- | --- | --- |
| Thomas P. Gies | 1976 | $255 |
| Laurel P. Malson | 1979 | 210 |
| Victoria L. Eastus | 1987 | 175 |
| Jocelyn C. Frye | 1988 | 160 |
| Karen L. Katz * | 1989 | 145 |
| Glenn D. Grant | 1990 | 130 |
| Katherine K. White | 1991 | 115 |
| Alice M. Jones | 1991 | 115 |
| Caryl M. Lazzaro | 1991 | 115 |

(* This timekeeper, Karen L. Katz, is no longer at Cromwell & Moring. Her rate is therefore based on a composite of the rates of several attorneys of the same level of experience.)

---

Mr. Barrett's declaration seeks a fee based on 353.25 hours of professional time, which is not disputed by the defendant. He seeks to be compensated at the rate of $300 per hour. In the affidavits and declarations supplied by Mr. Barrett, he sets forth justification for this rate in accordance with this Court's understanding of the decision of the U.S. Court of Appeals for this Circuit in *Save Our Cumberland Mountains, Inc.* For 353.25 hours of professional services at $300 per hour, Mr. Barrett seeks payment of $105,975.

In response to the Court's Order dated December 20, 1994, counsel furnished information respecting fees charged in similar litigation.

Ms. Janet Pitterle Holt, a partner in the firm of Hogan & Hartson and presently counsel of record for Howard University, furnished the following declaration. She reviewed cases reported in the *Daily Washington Law Reporter* over the past two years respecting employment discrimination matters and found no cases in which a practitioner was awarded attorneys fees at the rate of $300 per hour or higher in single plaintiff's employment discrimination law suits. Her inquiry revealed that lawyers who worked on similar cases charged much less for their services. She obtained a copy of the *Legal Service Sourcebook* from the District of Columbia Bar. She personally telephoned lawyers listing their specialty as "Employment, Labor, and Pension Law." Of the attorneys who responded, the standard billing rates ranged from $75 to $250 per hour and with the typical rate under $200. The average billing rate of those who responded was $164 per hour. From this investigation, defense counsel concludes that $164 per hour would be the highest reasonable rate. She emphasized that plaintiff had agreed to pay her attorney $125 per hour if she obtained relief on her complaint. She also noted that Judge Lamberth approved attorneys fees of $320 per hour for several "most experienced litigators" in the case of *In Re PEPCO Employment Litigation,* No. 86–0603. However, she emphasized that this was a class action case involving 117 named plaintiffs.

No specifics are furnished as to the identity of any of the counsel with whom Ms. Holt conferred. Counsel also emphasized that plaintiff's counsel used this same "inflated" figure for legal work that is traditionally performed by a paralegal.

In sharp contrast to the unspecified allegation of Ms. Holt, the Court notes that Mr. Keeney, a partner in Hogan & Hartson, fur-

nished an affidavit in the case of *Cheryl Feeling, et al. v. Sharon Pratt Kelly, et al.,* Civil Action 82–2994 in this Court, to the effect that Hogan & Hartson would bill $300 an hour for Mr. Cunningham's services and $275 per hour for Mr. Berlow's services. The Court's records further indicate that Mr. Cunningham is the managing attorney for Neighborhood Legal Services and Mr. Berlow is a solo practitioner.

On December 17, 1994, Mr. William P. Flanagan, also of Hogan & Hartson, filed a memorandum with the Court purporting to demonstrate that the April 26, 1994 *Landgraf* decision of the Supreme Court limited Title VII damage awards to conduct occurring subsequent to November 21, 1991.[2] The Court has previously filed a memorandum[3] respecting the Court's interpretation of the *Landgraf* case and that will not be repeated in this memorandum.

Hogan & Hartson's third memorandum dated October 17, 1994, filed by Ms. Holt on behalf of Howard University seeks to reduce the fees sought by plaintiff's counsel on the theory that the degree of success obtained justifies only a *de minimis* recovery. In her contention that plaintiff prevailed on only one of her three allegations, counsel relies on *Hensley v. Eckerhart.* It is noted that the Supreme Court concluded as follows:

> Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained. On remand the District Court should determine the proper amount of the attorney's fee award in light of these standards.

*Id.,* 461 U.S. at 440, 103 S.Ct. at 1943.

In his concurring opinion, Justice Brennan further clarified the language just quoted.

> The mere fact that plaintiffs do not prevail on every claim does not preclude an award of fees for all work reasonably performed,

but it is rarely an abuse of discretion to refuse to award fees for work done on nonprevailing claims that are not closely related to the relief obtained.

*Id.* at 452–53, 103 S.Ct. at 1949–50 (footnote omitted).

■ Counsel notes that three aspects of the plaintiff's claim are identified in the Court's opinion: sexual harassment, discrimination against plaintiff in not promoting her to the position of assistant dean for student affairs and an ongoing pattern of discrimination against plaintiff based on her sex and nation of origin which created a hostile work environment. From this, counsel contends that since plaintiff prevailed only on the hostile work environment aspect then only one-third of the requested fee should be paid. These claims all arise from the same nucleus of operative facts. Failure to adopt each of the contentions should not result in such a drastic reduction in the fee awarded. Justice Brennan, in his concurring opinion, puts it this way:

> Evaluation of the interrelatedness of several claims within a single lawsuit, and of the legal work done on those claims, is most appropriately a task for the district court that heard and decided the case, subject to appellate review for abuse of discretion. As the Court implicitly recognizes, the case before us manifests no clear abuse of discretion.

*Hensley,* 461 U.S. at 453–54, 103 S.Ct. at 1950. Reference is made in the Justice's opinion to the local case of *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 641 F.2d 880 (D.C.Cir.1980) (en banc).

> However, it sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories. No reduction in fee is appropriate where the "issue was all part and parcel of one matter," *Lamphere v. Brown Univ.,* 610 F.2d 46, 47 (1st Cir.1979), but

---

**2.** *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

**3.** *Park v. Howard University,* 863 F.Supp. 14 (D.D.C.1994).

only when the claims asserted "are truly fractionable," *id.*

*Id.,* 641 F.2d at 892 n. 18. There is an interrelation between plaintiff's hostile working environment contention and her claims of sexual harassment as well as the failure of the defendant to appoint her to the position of Assistant Dean.[4] This contention is brought into sharp focus by the remark of Dr. Pittman, who recommended against the appointment of Dr. Ushiyama, saying because she was an Oriental, she would probably have an anti-collegial attitude like Dr. Park. This remark went unaddressed by Dean Hill despite the admonition of Howard's Vice President, Dr. Alexis. Memorandum–Opinion at 9, ¶ 22 (D.D.C. April 8, 1994).

### Hostile Work Environment

The core complaint on which plaintiff relies and which is illustrated by the Court's findings of fact is the hostile work environment[5] to which plaintiff was subjected. After graduating from the defendant's School of Pharmacy *summa cum laude* and after obtaining her doctorate from Mercer University, plaintiff was welcomed back to the defendant University and installed as an assistant professor. She was given the assignment of establishing clinical practice sites and instructing students in drug therapy which involved the use of antibiotics in treating infectious diseases. She was given a leading role in teaching the use of antibiotic drugs and appointed to the Research Advisory Committee by Dean Hill. She was particularly interested in research concerning cephalosporins. Her research was adopted by the Howard University Hospital. Her contributions were commended by Doctors Trudeau and Malone, and Dean Hill. She was a member of the Pharmacy and Therapeutics ("P & T") Committee, the chairman of which was Dr. Robert E. Taylor. (Plaintiff's Exh. 12). A drug utilization review including Dr. Park's research was conducted under the auspices of the P & T Committee. Plaintiff's complaint of sexual harassment involved Dr. Taylor in that he solicited sexual favors from plaintiff.[6] Judge Hogan's prior Order granting partial summary judgment was predicated on the fact that the amended complaint contained no discrete claim of sexual harassment. The Order also specifically reserved to the trial judge the admissibility of such evidence. The Court permitted receipt of the evidence on the ground that it related directly to the charge of hostile work environment.[7]

An antibiotic usage advisory ad hoc subcommittee was established by Dr. Park to review Howard's utilization of antibiotics. Plaintiff was the prime mover in the development of this ad hoc subcommittee. She called meetings, set the agenda, presided over and produced written summaries of the ad hoc subcommittee on antibiotics. (Plaintiff's Exhs. 20, 22, 40). In April 1986, Dr. Olu Olusanya, Acting Chairman, Department of Pharmacy Practice, commended plaintiff for her research and "invaluable information she had compiled as a result of the research of the antibiotic subcommittee." (Plaintiff's Exh. 41).

In June of 1986, however, plaintiff was informed by Dr. Olusanya and Dr. Jerome Pittman that she might be removed from the

---

**4.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3rd Cir. 1990).

**5.** *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (unwelcome sex advances constitute hostile work environment); *Turner v. Barr,* 811 F.Supp. 1 (D.D.C.1993) (white U.S. Marshal of Jewish faith told to sit in rear of room by his African–American colleagues); *McKinney v. Dole,* 765 F.2d 1129 (D.C.Cir.1985) (unequal treatment based on sex of employee); *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503 (11th Cir.1989) (work environment must be considered in its totality).

**6.** *Bundy v. Jackson,* 641 F.2d 934, 944 (D.C.Cir. 1981) (unwelcome sexual advances constitute harassment and discriminatory work environment).

**7.** *McKinney v. Dole,* 765 F.2d at 1138 (unequal treatment of employee that would not have occurred but for the sex of the employee). *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971) (in a suit by Hispanic plaintiff hostile work environment was demonstrated by the discriminatory treatment of Hispanic customers).

antibiotic subcommittee. Plaintiff objected because she did not wish to be separated from her established practice sites in infectious diseases and from the antibiotic subcommittee. (Plaintiff's Exh. 49). Plaintiff was given no explanation for her removal and the reasons therefor except that she understood that she was to be removed to make room for a new faculty member, Dr. Mark Eggleston, a male African–American student of Dr. Park who had recently graduated. (Plaintiff's Exh. 56). The Court was not favored with any testimony indicating that Dr. Eggleston was more qualified or what his qualifications were. Memorandum–Opinion at 6, ¶ 13. All of Dr. Park's responsibilities and assignments on the antibiotic subcommittee and the P & T Committee were effectively terminated. Plaintiff sought clarification for her removal from her position on the P & T subcommittee without success. (Plaintiff's Exhs. 94, 104). The Court made a finding that plaintiff's career goals were hindered as a result of her diminished role at Howard and the termination of her participation in her specialty of antibiotic research.

In the summer of 1985, plaintiff discussed the possibility of promotion from assistant professor to associate professor with Dr. Terry Trudeau, Chairman of the department to which she was assigned. (Plaintiff's Exh. 29). Dr. Trudeau told plaintiff to collect the necessary papers and to make application. Plaintiff received letters of recommendation from Dr. Vinod Mody, Professor of Medicine, Dr. Robert Malone, Director of Pharmacy Services, and Dr. Gloria Nichols, President of the Howard University Alumni Association (Plaintiff's Exh. 30). Plaintiff expressed concern over her languishing application and in January of 1986, was advised by Dr. Olusanya that her promotion was under consideration. (Plaintiff's Exh. 35).[8]

The application for promotion of Dr. Jerome Pittman, an African–American male, who applied after plaintiff, was under consideration at the same time. When Dr. Pittman received his promotion, plaintiff was advised that the rules had been amended. When plaintiff sought to obtain information as to the circumstances of Dr. Pittman's promotion, the request was denied. At the suggestion of Dr. Olusanya (Plaintiff's Exh. 37), plaintiff obtained additional recommendations from Dr. S.M. Siram, Associate Professor and Director of the Trauma Center Surgical Intensive Care Unit and Dr. Wayne Grieves, Chief of the Infectious Diseases Division. (Plaintiff's Exhs. 43, 47). On September 30, 1986, plaintiff's application was again rejected. (Plaintiff's Exh. 53). Plaintiff was told that the new criteria was the reason for the rejection. Since Dr. Pittman was promoted in the interim, plaintiff sought a copy of his application to use it as an example of a proper application. Contrary to the practice at Howard of sharing such information, plaintiff was denied a copy of Dr. Pittman's application.

Plaintiff received her promotion to associate professor effective August 15, 1987, almost two years after her application was filed in October 1985. (Plaintiff's Exh. 63). Plaintiff was afforded no explanation for the delay in promotion nor was any credible testimony offered on this subject by defendant. The Court specifically held that the defendant's explanation for the delay was not credible. Memorandum–Opinion at 8, ¶ 20.

The hostile atmosphere toward Asian–American females characterized Dean Hill's attitude. When Dr. Suzi Sushiyama, a Japanese–American female, applied for a faculty position at Howard on January 12, 1988 (Plaintiff's Exh. 71), Dr. Pittman made the comment that because she was an Oriental, she would probably have an anti-collegial attitude like Dr. Park. (Plaintiff's Exh. 75). Plaintiff notified Dean Hill of this remark, which she believed was unethical, racist and illegal. Dr. Carlton P. Alexis, Interim Vice President for Health Affairs, advised Dean

8.  One of the reasons that plaintiff's application languished was because of Dr. Taylor's—one of the parties accused of sexual harassment—unexplained delay in recommending Dr. Park for tenure. Memorandum—Opinion at 7. Dr. Park needed Dr. Taylor's recommendation because, as chairman of the P & T committee, he supervised plaintiff's research on the antibiotic subcommittee and her performance as clinical pharmacist. Transcript of Trial at 178–79. The Court found that the recommendation produced at trial, Plaintiff's exhibit 29, was not correctly dated. Memorandum–Opinion at 7, ¶ 17.

Hill to inform Dr. Park in writing of the University's equal opportunity policy. (Plaintiff's Exh. 79). This Dean Hill failed and neglected to do. The Court found that plaintiff was never informed of any action by Howard to address the impropriety of Dr. Pittman's comment. Dr. Sushiyama was not hired by Howard. Memorandum–Opinion at 8, ¶ 22.

In the summer of 1991, Dr. Vasant G. Talang, the Associate Dean of the College of Pharmacy, told plaintiff that he wished to recommend her for the chairmanship of the Doctor of Pharmacy ("Pharm–D") Research Committee since he planned to retire from that position. Dr. Talang further testified that he met with Dean Hill, who decided not to change the structure of the administration at that time. On February 24, 1992, plaintiff wrote Dr. Talang in reference to the chairmanship of Pharm–D Research Committee. (Plaintiff's Exh. 119). Dr. Talang responded on March 26, 1992 (Plaintiff's Exh. 124), that there would be no change in the status of the Committee at that time. Plaintiff requested an explanation from Dr. Talang concerning the withdrawal of the oral offer of the chairmanship. (Plaintiff's Exh. 125). No explanation was given plaintiff nor was any satisfactory testimony offered in court.

Plaintiff wrote Dean Hill expressing interest in the position of Assistant Dean for Student Affairs. (Plaintiff's Exh. 117). Not having heard from Dean Hill for approximately four months, plaintiff again wrote the Dean inquiring about proper procedure. (Plaintiff's Exh. 120). Subsequently, plaintiff learned that Dr. Bertrand Nicholas had been appointed Assistant Dean for Student Affairs by receiving a routine communication. (Plaintiff's Exh. 126). Dr. Nicholas, a white male, had occupied the position of Assistant Dean for Student Affairs at the Massachusetts College of Pharmacy. Dr. Talang testified that plaintiff was well qualified for the position of Assistant Dean. Transcript of Trial at 425. She was a successful professor and had established an impressive relationship with her students. (Plaintiff's Exh. 155). Pharmacy students at Howard have presented to plaintiff five awards and plaques in recognition of her work as a faculty member. Dr. Talang further testified that the reason for Dr. Nicholas' appointment was his experience as Assistant Dean of Student Affairs at Massachusetts College of Pharmacy. The Court credited this testimony of Dr. Talang. The Court also found no serious consideration was afforded plaintiff for this position. Memorandum–Opinion at 11, ¶¶ 29–20. Defendant proffered that she was told that she was not given the position because of her interest in research. This explanation is pretextual and inconsistent with her removal from the chairmanship of the antibiotic research subcommittee.

Regina Carson, an African–American female and junior faculty member, was named coordinator of the clerkship committee for the Bachelor of Science program. She was also named to succeed plaintiff as coordinator for the Pharm–D program. Ms. Carson had no teaching experience and no testimony was offered as to her qualifications for replacing plaintiff in these two assignments. There was no intimation in the testimony offered on behalf of defendant or in cross-examination of plaintiff's witnesses that the service rendered by the plaintiff in these several assignments was unsatisfactory or that it was anything other than deserving of the commendations that she received from many faculty members, including even Dean Hill. The only explanation for this action by the defendant is that the defendant's representatives desired to remove this highly qualified, tenured professor from the positions of influence at the University was because of her ethnicity and gender and her lack of response to Chairman Taylor's sexual suggestions.

The evidence clearly demonstrates that plaintiff was subjected to a hostile work environment by the defendant and defendant's agents. The Supreme Court has recently held in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), that in order to recover in a case involving abusive work environment harassment, a plaintiff need not prove psychological injury. The plaintiff offered and the Court received and credits the testimony of her physicians to the effect that she did as a result of this discrimination receive psychological and physical injury and damages.

The Supreme Court in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), quoted with approval Judge Goldberg's definition of hostile work environment:

> "[T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...."

*Id.* at 66, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). From the incidents recounted by the Court and taken from the record, it can readily be seen that plaintiff was literally stripped of the responsible positions she had earned during the course of her service at the defendant University. This was without any charge that she had performed her duties in an unsatisfactory manner. Persons chosen to replace her had limited, if any, qualifications. None were alleged at the trial.

The Eleventh Circuit, in *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503 (1989), emphasized the need for considering the totality of the evidence rather than each instance in isolation.

> By contrast, the district court in the present case used a two-step analysis to determine whether the plaintiff's evidence was sufficient to withstand the defendant's motion for JNOV. First, the district court examined each individual allegation of discrimination in turn, and found that the plaintiff had made out a prima facie case of discrimination only as to the two noose incidents. Next, the court held that two

incidents of discrimination are too few, as a matter of law, to establish a harassment claim under § 1981.

*Id.* at 1511.

Based on the record in its entirety and the authorities which have been cited, the Court concludes that, but for the violation by the defendant of the plaintiff's rights under 42 U.S.C. § 2000e–2, which reads as follows, "(a) **Employer practices.** It shall be an unlawful employment practice for employer—(1) ... to discriminate against any individual with respect to [her] ... sex, or national origin;" these incidents would not have occurred.

■ The number of hours plaintiff's counsel has documented is uncontested. It is 353.25 hours. The only argument defendant makes is that plaintiff did not prevail on all of her allegations. She did, however, prevail upon the core allegation, hostile work environment to which the other allegations are interrelated.[9] Plaintiff's counsel is a distinguished and experienced civil rights lawyer whose credentials are set forth herein and are beyond dispute. He is entitled to be paid a standard lodestar figure of hours spent multiplied by the figure of $300 per hour for 353.25 hours which results in a figure of $105,975, and which is justified by *Save Our Cumberland Mountains, Inc.,* 857 F.2d at 1524, from which we quote:

> We therefore expressly overrule *Laffey* to the extent that it imposes the above discussed different method of determining reasonable attorney fees on attorneys situated as Yablonski and Galloway are here. Henceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations *shall apply as well* to those attorneys who prac-

---

9. The core facts to the claims of sexual harassment and the denial of the assistant deanship are interlocking with, and supportive evidence of, the claim of hostile work environment. The main players, in each incident, are Dean Hill and Chairman Taylor. This pair systematically stripped Dr. Park of every leadership position at the Howard College of Pharmacy. This Court notes the substantial "factual overlap" in the related claims. *Goos v. National Ass'n of Realtors,* 997 F.2d 1565, 1570 (D.C.Cir.1993). Plaintiff was unable to prevail on these distinct claims but the facts surrounding the claims were completely subsumed into the poisonous atmosphere which fostered the hostile work environment at Howard.

tice privately and for profit but at reduced rates reflecting non-economic goals.

*Id.* at 1524 (emphasis added).

The Court notes that plaintiff's counsel undertook this case on a contingent fee basis and further, that it involved a difficult and unusual situation in that there are few cases involving hostile work environment based on ethnicity and gender.

Mr. Barrett was assisted in his representation of the plaintiff by Sandra Gustave, who received her Juris Doctor Degree in 1992 from the defendant University. Her services as a paralegal and law clerk add up to 72.25 hours. Compensation at the rate of $75 an hour for her under the *Laffey* matrix, as amended, is sought. The total for her services is $5,418.75. The Court finds that this is reasonable.

In Attachment G, plaintiff seeks to be reimbursed for expenses detailed therein in the amount of $1,697.58. This request is reasonable and the Court approves it. It is not challenged by the defendant.

### CONCLUSION

Accordingly, upon consideration of the foregoing, the Court approves Mr. Barrett's applications as follows: $105,975.00 for legal services rendered by him; $5,418.75 for legal services rendered by Sandra Gustave; reimbursement for expenses paid in the amount of $1,697.58.

SO ORDERED.

### EXHIBIT 1

United States District Court
for the District of Columbia
Washington, D.C. 20001

Chambers of
Harold H. Greene
United States District Judge

January 4, 1995

### MEMORANDUM

TO: Judge Gasch

FROM: Judge Harold H. Greene

I understand that you are considering a fee request from St. John Barrett who represented the plaintiff in a civil rights case you tried, and you asked for my opinion of this attorney.

I worked with Mr. Barrett for a number of years in the Department of Justice in the 1950s and '60s, and I had the opportunity to ascertain his legal ability and reliability. On both counts, I would give him the highest marks. "Slim" Barrett is one of the finest attorneys I have met in the course of my career and his credibility is unimpeachable. I am certain that any fee request he may submit will be completely justified.

/s/ [Signature]

### EXHIBIT 2

Superior Court of the District of Columbia
Washington, D.C. 20001

Joseph M.F. Ryan, Jr.
Judge

December 22, 1994

The Honorable Oliver Gasch
United States District Court
3rd & Constitution Avenue, N.W.
Washington, DC 20001

Re: St. John Barrett, Esq.

Dear Judge Gasch:

You have asked me to comment on the professional ability of Attorney St. John Barrett, based on my association with him.

When the Civil Rights Division of the United States Department of Justice was formed in the late 1950's, St. John Barrett was named Executive Assistant to Assistant Attorney General W. Wilson White, who was in charge of the division.

As First Assistant to the Assistant Attorney General, and later upon Mr. White's retirement, as Acting Assistant Attorney General, I held the position of Immediate Superior to Mr. Barrett, and thus had substantial opportunity to observe his performance and character.

During this period when the division had but a small staff, Attorney Barrett worked long and diligently, and with a high degree of

professional competence in his work. His legal knowledge and ability were of a high order, as was his integrity and his sense of duty.

If there is any additional information that would be of help to you, I would be happy to supply whatever I can recall.

Sincerely,

/s/ Joseph M.F. Ryan, Jr.

Joseph M.F. Ryan, Jr.

Senior Judge

JMFR/vs