Juanita **GRIFFIN,** Plaintiff,

v.

**WASHINGTON CONVENTION CENTER,** Defendant.

No. 93–2297(JMF).

United States District Court, District of Columbia.

Nov. 21, 2001.

Richard Hugh Semsker, Lippman & Semsker, Washington, DC, for Plaintiff.

Melvin W. Bolden, Jr., Office of Corporate Counsel, D.C., Washington, DC, for Defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This matter is before me for resolution of *Plaintiff's Motion for Attorneys' Fees and Costs* ("Plains.Mot."). By *Order* dated February 20, 2001, I denied plaintiff's motion without prejudice. My rationale in doing so was that I believed that ethical concerns were raised by the nature of the fee arrangement made between plaintiff and her counsel. It was my impression that the fee arrangement allowed plaintiff's counsel to receive both a contingency fee and a judicial award of attorneys' fees. As I now understand it, this is not the case. According to *Plaintiff's Motion for Reconsideration of Plaintiff's Motion for Attorneys' Fees and Costs* ("Plains. Mot.2"), "under the fee agreement between Plaintiff and her counsel, Plaintiff's counsel is entitled to *either* a contingency fee or the attorneys' fee award, whichever is greater, but not both." Plains. Mot. 2 at 2 (emphasis added). Therefore, I will now address the actual merits of plaintiff's fee petition with the understanding that counsel will only receive the fees I award.

### I. BACKGROUND

Plaintiff, Juanita Griffin ("Griffin"), was employed as an electrician for the Washington Convention Center ("Convention Center") from 1984 to 1992. Griffin claimed that the Convention Center fired her because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–16 *et seq.*, (1994).

The first trial ended in a defense verdict which was reversed on appeal. *Griffin v. Washington Convention Center*, 142 F.3d 1308 (D.C.Cir.1998). The second trial resulted in a verdict for plaintiff. I then awarded plaintiff final judgment which (1) reinstated plaintiff to her former position at the Convention Center; (2) restored to plaintiff all the benefits, including vacation, sick leave, and pension (whether service credits or cash), that she would have earned had she not been discharged by the Convention Center and had she been employed by the Convention Center since the date of her discharge; and (3) awarded her $278,528.77 in back pay, which figure included pre-judgment interest and (4) the $19,000 which the jury had found was the compensatory damages she suffered by being illegally discharged.

### II. The Contract

Unfortunately, the contract said to govern the fee[1] cannot be found. Plaintiff and her counsel agree that she signed an initial contract (Exhibit 1 to *Plains. Mot.* 2) which provided that she was to pay Solaman Lippman $150 per hour and Richard Semesker $125 per hour. There was no contingency agreement in this contract.

Although he cannot find it, Semsker, represents, however, that Griffin signed a second contingency agreement at about the time a complaint was filed in this Court. Under this agreement, plaintiff agreed to a one third contingency payment of attorney fees. While counsel reports that plaintiff has no recollection of signing the second agreement, he notes that she signed an Accounting of Funds and Release in which she acknowledged that (1) counsel could immediately deduct one third from what the Convention Center had paid her (2) she would also receive two thirds[2] of any attorney fees awarded.

---

1. I will refer to plaintiff's counsel as "counsel" or by the last name of lead counsel, Semsker.

2. The accounting says one third but counsel indicates that this is a typographical error.

In addition, Semsker claims that the following provisions were also in the missing retainer agreement plaintiff signed:

H. Lippman shall be entitled to a fee equal to one third (33⅓ %) of all monies, compensation, benefits, attorneys' fees, and any other damages of any type awarded Plaintiffs by judgment or settlement. . . .

I. If the sum subject to the Contingency Fee includes an award of Attorneys' Fees, the amount of Lippman's Contingency Fee will not be less than the Attorneys' Fees award, notwithstanding any other provision of this Agreement.

Exhibit 2 at 3.

Thus, Semsker argues, counsel gets all the fees awarded even though the fees exceed one third of the judgment plus the fees.

The difference is substantial. Plaintiff has signed an acknowledgment that the total financial value of the final judgment was $347,437.68. Exhibit 2 to *Plains. Mot 2.* Hence, if plaintiff were to be awarded the contingency fee of one third of the judgment, plaintiff's counsel would receive from the defendant the $115,812.56 that counsel has already deducted from the payment to plaintiff. If the court were to award fees using the hourly rates counsel proposes, counsel's recovery would be $237,689.75 [3] but plaintiff would get nothing more. Instead, counsel would remit to her the $115,812.56 counsel deducted from the initial payment to her.

The inability of counsel to find the actual retainer agreement is troubling. The record will reflect that, when the defendant paid the judgment by sending a check to plaintiff's counsel plaintiff wrote me objecting to the distribution her counsel was proposing. I brought her letter to counsel's attention and I now have to assume from her signature on the Acknowledgment that her objections were overcome. Nevertheless, in an abundance of caution, I will make my order awarding fees in this case provisional and permit plaintiff to have twenty days to file any opposition. I note, in this context, that plaintiff has now received a substantial judgment and is in the position to hire counsel to handle a discrete issue. I urge her to make any objection by counsel.

### III. Motion for Attorneys' Fees and Costs

In *Plains Mot.,* Semsker plaintiff's lead counsel, states that he and his colleagues (Shannon Salb, Marissa Suarez, and Solaman Lippman [4]) spent a total of 942 hours in various stages of the litigation.[5]

Counsel contends that the total amount of fees should be determined by multiplying the number of hours reasonably expended by a reasonable hourly rate to

---

3. Counsel's arithmetic is chaotic. Counsel claims $237,689.15 in fees on page 12 of the fee petition but $249,577.20 on the next page. *Plaintiff's Memorandum of Points and Authorities In Support of Plaintiff's Motion for Attorney Fees and Costs ("Memo to Plains. Mot ")* at 12–13. In *Plains Mot. 2* however, counsel says that $248,040.75 is "the full amount" of the fee petition. Additionally, on page 4 of the Memorandum, counsel represents the total number of hours spent on the litigation to be 942.55 but on page 12 states that the hours spent were 895.55. Without some explanation for all this, I have decided to use the lower figures of 895.55 hours and

$237,689.15. Given my resolution of the case, the starting figure is academic.

4. The number of hours claimed by Lippman are *de minimis.*

5. The calculation for each of the four attorneys is broken down into ten task categories: 1) initial work-up and pleading, 2) motions and remand to EEOC, 3) discovery, 4) pretrial and trial preparation, 5) trial (April 1997), 6) appeal, 7) pre-trial and trial preparation (1999), 8) trial (August 1999), 9) post-trial litigation, and 10) attorneys' fee petition.

arrive at a "lodestar." Plaintiff, however, was never charged an hourly rate. She paid $1,000 to retain counsel and counsel agreed to represent her on the contingent basis I just described, i.e. one third of the judgment or the fees awarded, whichever was greater. Although the client never paid any hourly rate, counsel argues that a reasonable hourly rate should be based on "prevailing market rates" as set by the "Laffey matrix." The "Laffey" matrix was accepted by the court in *Laffey v. Northwest Airlines, Inc.* 572 F.Supp. 354 (D.D.C.1983), *rev'd on other grounds*, 746 F.2d 4 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). The matrix creates one axis for a lawyer's years of experience in complicated federal litigation and a second for rates of compensation. The intersection is the "Laffey" rate which has since increased annually using either of two methods.[6]

■ In this case, payment by the defendant of a reasonable attorneys fee is specifically authorized by the Civil Rights Act of 1964.[7] Therefore, "the determination of an award of reasonable attorney fees is at bottom a question of statutory interpretation," *Save Our Cumberland Mountains, Inc., v. Hodel*, 857 F.2d 1516, 1518 (D.C.Cir.1988), and courts must determine what is "reasonable." Since defendant concedes that plaintiff prevailed and that the number of hours claimed is reasonable, the only question presented is whether the rates counsel seeks are reasonable.

One can begin with the premise that, in the ordinary case, a fee based on the actual rates an attorney charges would be prima facie reasonable. There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay. In an efficient market, a "reasonable" rate set by the court should mirror the attorney's actual rate because no attorney will charge less than that rate if he can get it and no client will pay more. The "Laffey" matrix was derived, after all, from a survey of data of the rates lawyers actually charged their clients. Thus, if the market is working correctly and the "Laffey" rates are accurate, lawyers should be getting the "Laffey" rates from their clients.

■ Initially, this Circuit concluded, that if lawyers charge certain discounted rates for charitable or public service purposes, they are only entitled to these reduced rates when they seek fees under a fee shifting statute. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d at 4. *Save Our*

---

6. The Laffey matrix charts fees only up to 1988–89 (see Appendix A), but plaintiffs have updated the Laffey matrix's 1988–89 rates by adopting the extrapolation method employed by the district court in *Robles v. United States of America*, No. 84–3635, 1992 WL 558952 (D.D.C. Jan. 10, 1992). In *Robles*, the district court updated the Laffey matrix by adding $10 per hour to the 1988–89 hourly rate of $220 and to the hourly rates of each succeeding year. See *Robles*, slip op. at 16 & n. 7. Plaintiffs have followed the Robles approach, adding $10 raises to each year after 1988–89 to calculate a current (1992–93) rate of $260 per hour. (Pls.' Application, at 23.) The U.S. Attorney's Office's matrix also awards counsel with 11–19 years of experience a rate of $260 per hour for 1992–93. The

U.S. Attorney's Office extrapolates its matrix by adding the Consumer Price Index increase for the Washington, D.C., metropolitan area to the prior year's rate, and rounding upwards if the sum is within $3 of the next $5 multiple.
*Covington v. District of Columbia*, 839 F.Supp. 894, 900 (D.D.C.1993), *aff'd* 57 F.3d 1101 (D.C.Cir.1995).

7. In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
42 U.S.C.A. § 2000e–5(k)(1994).

*Cumberland Mountains, Inc. v. Hodel*, 857 F.2d at 1524, reversed that determination, however, and held that attorneys who practice "privately and for profit but at reduced rates reflecting noneconomic goals" must be compensated at the prevailing market rates rather than the actual and reduced rates they charge clients deemed worthy of those reduced rates. It is therefore the law of this Circuit that an attorney who charges certain clients reduced rates for public spirited purposes is nevertheless entitled to be compensated at market rates, provided he establishes that he charges reduced rates in certain instances and that his skill, experience, and reputation justify the higher rates he seeks which he has also established are the market rates in the community. *Covington v. District of Columbia*, 57 F.3d 1101 (D.C.Cir.1995)

In this case, counsel claim the benefit of this model and the resulting "Laffey" rates but an examination of the way in which counsel actually practice law makes clear that portraying themselves as charging "reduced" rates for Title VII work to fit within this paradigm is awkward and unsatisfactory. One can begin with a comparison.

Take a law firm which has, let us say, an insurance defense practice in which carriers pay its hourly rates. A member of the firm, believing that the firm has a public responsibility to do so, has committed the firm to act as counsel to a public interest group. The firm subsequently agrees to represent an indigent person, referred to it by the group. The firm has an understanding that the group will compensate it at a rate substantially less than the rate it charges the carriers. Indeed, it may even write off the fees due if they are too much for the group to bear. If it happens, however, that the law firm represents the indigent person in a case involving a fee shifting statute and the client prevails, it would be grossly unfair to compensate the law firm at what it actually charged as opposed to its normal hourly rates. There is no reason why the defendant should benefit from the law firm's beneficence and escape paying fair compensation because the law firm was generous with its time. Additionally, every hour spent by the firm representing the indigent was an hour not spent representing a carrier at its normal rate. To force it to accept a discounted rate would be the surest way to discourage it from accepting such representations. That is the precise converse of what courts are supposed to be doing: encouraging lawyers to take such cases by having the defendants pay them fairly.

The Semesker law firm tries to shoehorn this case into this model of professional beneficence but the shoe doesn't fit. The law firm asserts that it discounts its Title VII plaintiffs' work and charges less than it charges those clients who pay it on an hourly basis. This case, however, shows that it does no such thing. First, this law firm never expects to receive its hourly rate from those clients and it never "charges" its plaintiff clients anything. Instead, the law firm has two profit centers in the firm, its contingent work and its hourly business. It charges its hourly clients whatever the traffic will bear and then collects it promptly, irrespective of the client's success or failure. It represents Title VII plaintiffs on a contingent basis and gets paid nothing if the client loses but gets no less than one third of the judgment if the client wins.

When one views the economic realities coldly and puts aside the fatuousness of talking about "discounted" hourly rates which are never really billed or paid, then the contract between plaintiff and her counsel can be seen for what it is: a contingent contract between a nearly indigent plaintiff and counsel. The firm pro-

poses that "Laffey" rates are used not because it charges and receives those rates from Title VII plaintiffs but to enhance the lawyer's recovery above one third of the final judgment.

The question then becomes whether this contract, which uses the "Laffey" rates to enhance counsel's recovery substantially beyond a one third contingency, should be enforced according to its terms when the use of current "Laffey" rates generates a contingency fee substantially greater than that counsel would have accepted had the court not awarded fees greater than one third of the judgment.

First, there is nothing automatic about the application of "Laffey" rates. They are not like a GS schedule where government employees advance to the next step by virtue of time in grade. Instead, they attempt to reflect what the market will pay with the understanding that the market will pay more for lawyers who are experienced in complicated, federal litigation. Counsel insists, however, that he and his associates should be awarded current "Laffey" rates to allow for the delay in payment. This insistence lends an air of unreality to many aspects of the fee petition.

For example, Marisssa Suarez was admitted to the District of Columbia bar in 1997 and worked on the first appeal in that same year. It is the understandable practice of the bar to delegate the drafting of briefs to the most junior associates. Since they do the heavy lifting but are compensated the least, this makes economic sense. Only the wealthiest can pay the premium rates that a lawyer of 20 years can command and they must be very rich indeed if they can pay her to write a brief. Since Suarez was but one year out of law school and newly admitted to the bar, Suarez understandably did the lion's share of the briefing on the first appeal as a first year associate. Yet, counsel seeks to have de-fendant compensate her for this work at a rate that would be paid for an attorney with four to seven years experience in complex, federal litigation. Thus, counsel seeks to have her paid what the market would pay for the trial work of an attorney with four to seven years federal trial experience when she absolutely had no such experience, was a year out of law school, and when all she did was to write a brief.

Counsel's other associate, Shannon Salb, does not fare much better. Counsel asks that he be compensated at the same rate as Suarez, i.e., at the current rates for an attorney with four to seven years of trial experience. But, Salb was admitted to the District of Columbia bar in 1996 and is yet to try his first Title VII case; as he did in this case, he has "second chaired" several. While he is said to have been "lead counsel in numerous litigations" *Affidavit of Richard Semsker in Support of Plaintiff's Motion for Attorney Fees* at ¶¶ 8–11, these litigations are not described and there is therefore no basis upon which to describe them as complicated, federal litigation. We are told that his "published decisions" include six published decisions which are set out in the fee petition. A review of the decisions indicate, however, that he either assisted in the writing of a brief on appeal or argued a discovery or jurisdictional motion in this Court. Yet, if counsel have their way, he is to be compensated as if he had been trying Title VII and other federal cases for four to seven years even though he is yet to try his first Title VII case as lead counsel.

Third, Semsker claims that his firm secures the "Laffey" rates when it is compensated on an hourly basis and further supplements that showing by producing affidavits of well respected counsel asserting that Semsker could command "Laffey" rates if he would undertake the representation of defendants in Title VII work.

Perhaps. But, Semesker has chosen instead to undertake the representation of Title VII plaintiffs on a contingency basis with the realization that if their client loses they get nothing. That defense counsel command a certain rate for their services when payment is insured and paid on a monthly basis does not tell us very much about what Title VII plaintiff's counsel consider reasonable compensation when they run the risk of getting absolutely nothing and when they will nearly always have to wait for their money. I, for one, find it inconceivable that Semsker would be content to have his contingent fees yield no greater profit than his hourly fees when he undertakes the risk of getting nothing and having to wait for his money, even if he wins. Even if that were not true, it must be remembered that Semsker and his firm would have accepted a one third contingency fee if the court did not award a greater fee. Whatever suppositions can be made about the rates Semsker could charge if he were a defense lawyer, to say that he would not have undertaken this representation unless he was assured "Laffey" rates stands the actual fee agreement on its head. He expressly agreed to accept a flat contingency rate if that was the best he could do.

Fourth, Semesker's insistence on the use of the current "Laffey" rates is a bit of legerdemain. As I pointed out, the back pay I awarded includes pre-judgment interest. Hence, if counsel were to take a flat contingency fee, they would get the benefit of the pre-judgment interest, which is designed to compensate the prevailing party for the delay in payment. But, if counsel gets current "Laffey" rates, the defendant, having compensated plaintiff for the delay in payment, has to compensate counsel for that delay in payment even though counsel freely undertook the risk of that delay when counsel undertook

the representation. I can think of no reason to force defendant to make such a "double" payment when it is brought about solely because counsel will not accept the contingency fee and wants "Laffey" rates instead.

Finally, the contractual arrangement here mandates the expenditure of judicial resources solely for the benefit of plaintiff's counsel. Defendant's objection to the fee on the grounds that plaintiff's counsel has never received from paying clients the "Laffey" rates has forced the expenditure of substantial judicial resources in order to write the memorandum. But, the Supreme Court has commanded that this part of the litigation be the simplest, not the most complicated,[8] and the judicial inquiry the contract forced me to conduct into the reasonableness of the fees sought contradicts that express command. While judges get paid to decide cases, the Supreme Court has demanded that they and counsel bring the fee litigation to the promptest conclusion possible. This contract guarantees the exact opposite since counsel has to know that the District of Columbia and its agencies, unlike the United States Attorney's Office, generally contests plaintiff's counsel's use of the "Laffey" rates.

The unreality of "discounted" but never billed fees, of paying associates on the basis of 4 to 7 years experience in complicated federal litigation when they are yet to try their first federal case, of paying a lawyer the hourly rates in a job he might get if he quit his present one, and the other "unrealities" in this fee petition I have catalogued convince me that awarding the "Laffey" rates sought would be a gross abuse of discretion. Thus, I am back where I started: what is a reasonable fee?

---

**8.** *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)

■ Fortunately for me, the defendant had provided me with a floor. The defendant concedes, without specific explanation, counsel's entitlement to $187,780.10 which is 79% of the "Laffey" rates counsel seeks, i.e. $237,689.75. I have decided to award a fee of $195,000 instead.

I have taken pains to point out that this is, in reality, a contingent fee case and I first note that the fee I am awarding represents a generous 56% of the judgment awarded. On the other hand, an undiluted, flat application of the "Laffey" rates yields a remarkable 68 % contingency fee. Thus, in a case in which counsel began the representation at a flat $150 an hour and would have been content to accept one third of the judgment if that was more than the attorney fees awarded, counsel now secure from the defendant a 68% contingency fee, which, in my experience, is utterly unprecedented. Indeed, I cannot imagine any court in the country that would describe such a fee as reasonable if the client had to pay it and I am hard pressed to understand why it somehow becomes reasonable when the defendant has to pay it.

■ ˎ Of course, that the statutory fee exceeds the contingent fee is of little moment if the statutory fee is reasonable which, in this context, means reflective of actual rates in the market and sufficient to attract lawyers to Title VII plaintiffs' work and to deter defendants from violating an individual's statutory rights *See Copeland v. Marshall*, 641 F.2d 880, 888 n. 13 (D.C.Cir.1980)(en banc); *Davis v. Bolger*, 512 F.Supp. 61, 63 (D.D.C.1981) But, if I compensate counsel $195,000, some one

would then have to convince me that unless the "Laffey" rate, (yielding $237,689.75), were paid, Title VII plaintiffs' work would go begging even though counsel received a 56% contingency fee of a substantial judgment or that $237,689.75 would deter defendants from violating their employees' statutory rights but $195,000 would not. I cannot imagine any responsible lawyer, familiar with the dynamics of Title VII litigation, providing such cynical and incredible testimony.

Finally, I believe that $195,000 is reasonable and fair compensation when one uses the traditional considerations that have been used to assess the reasonableness of such fees.[9]

1. **The time and labor required.** Defendant raises no objection to the reasonableness of the hours expended. I have reviewed them and find them reasonable. While it may be mixing apples and oranges to consider hourly rates in the context of assessing the reasonableness of a contingent fee, I note that $195,000 yields an average hourly rate of $216. The "Laffey" rates yield an average hourly rate of $265 per hour. But, the total "Laffey" fee is inflated by the use of current hourly rates for Salb and Suarez which, as I have explained, are utterly incorrect. Allowing for that difference, the distance between the average hourly rate of an award of $195,000 and the average hourly, "Laffey" rate narrows further.

2. **The novelty and difficulty of the questions presented.** While the is-

---

**9.** The seminal case on the factors which should guide the determination of the reasonableness of a fee is *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717–720 (5th Cir.1974), although one aspect of the decision, that a contingency fee placed a ceiling on a Title VII fee award, did not survive the

later Supreme Court decisions in *Blanchard v. Bergeron*, 489 U.S. 87, 89, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). *See Save Our Cumberland Mountains*, 857 F.2d at 1522 (describing *Johnson* factors as "familiar in the jurisprudence of attorneys' fee awards.")

sue on appeal raised a nice question of law, there was nothing about the trial that raised complicated issues of law. It was as straight forward a Title VII case as one will see. Plaintiff claimed she was the victim of sexual discrimination; defendant denied it and insisted that she was fired because she was incompetent.

3. **The skill requisite to perform the legal service properly.** Counsel displayed the skill one expects of trial counsel in Title VII work but, as just noted, did not face any particularly complicated legal questions once the appeal was completed.

4. **The preclusion of other employment by the attorney taking the case, whether the fee is fixed or contingent, the customary fee and awards in similar cases.** As I have explained, plaintiff's counsel has a Title VII contingency practice and does not claim the preclusion of other business. As I have also explained, I know of no court that has ever come close to awarding a 69% contingency fee in a Title VII case. Based on my daily experience in handling Title VII cases I would think that a 56% contingent fee would be generous in any survey of awards in Title VII cases in which counsel was compensated on a contingent basis.

5. **The experience, reputation and ability of the attorneys.** Semsker is an experienced Title VII practitioner and represented plaintiff ably. He has submitted affidavits from fellow members of the bar attesting to their ability and nothing I saw at trial contradicts those statements. On the other hand, Salb and Suarez (who worked only on the appeal) are relatively junior members of the bar with no actual "first chair" experience in Title VII cases.

6. **The amount involved and the results obtained.** Counsel accomplished for plaintiff everything she sought. It must be recalled, however, that the jury award of compensatory damages for pain and suffering was relatively small and the lion's share of the award was the back pay which resulted from the long delay between the plaintiff's firing and the judgment in her favor. This case cannot therefore be equated to a case in which counsel's advocacy is a most significant factor in the size of the award.

Considering all these factors, I cannot possibly justify an award of counsel fees of $248,040.75 in a Title VII case where the judgment was $347,437.68. While counsel are to commended for pursuing an appeal of the first unsuccessful verdict, they had to persist to gain any fee at all. Once that appeal was completed, the resulting case was a simple Title VII action involving a handful of witnesses on each side and a short trial. No appeal was taken from the second verdict and the computation of the back pay award and the other aspects of plaintiff's postverdict entitlement were matters, for the most part, of arithmetic. Therefore, I will award plaintiff $195,000 in attorney fees. I view this as a most reasonable award when one considers the time expended, the results obtained, and the legal and factual questions presented. As I have noted, defendant concedes plaintiff's entitlement to $187,780.10 which serves as a convenient floor to any "reasonableness" determination. The $195,000 I have awarded yields a contingency fee of 56% which I am certain from my daily experience handling such cases, particularly in settlement discussions, is sufficient to attract counsel to

Title VII cases. I have every reason to be equally optimistic that such an award will have a deterrent effect on the defendant, lest it have to pay a similar award in the future. In addition to the judgment already rendered, the attorney fees I am awarding will require the defendant to pay the total sum of $542,437.68 for firing a single employee for what the jury found to be a discriminatory reason. If that does not deter the defendant from doing the same thing again, I do not know what will.[10]

---

10. Plaintiff also seeks costs but, under LCvR 54.1, the Clerk of the Court taxes costs and plaintiff must comply with that rule by first filing a bill of costs with the Clerk. The Clerk's disallowance or allowance of costs can then be reviewed by this Court. LCv.R 54.1(e).